# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Slater v. Department of Children & Family Services, 2011 IL App (1st) 102914**

---

| | |
|---|---|
| Appellate Court Caption | ASIA SLATER, Plaintiff-Appellant, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES and ERWIN McEWEN, as Director of the Department of Children and Family Services, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1–10–2914 |
| Filed | June 17, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Department of Children and Family Services' entry of an indicated finding of neglect against plaintiff, a 17-year-old mother, based on an incident in which plaintiff's daughter fell on a colored pencil plaintiff was using for a school art project and the pencil pierced the child's neck and punctured her lung, should have been expunged pursuant to plaintiff's complaint for administrative review, notwithstanding the fact that the child was seriously injured, since the injury itself did not require an automatic finding of neglect; rather, the administrative law judge was required to determine whether the injury was the result of plaintiff's neglect, and in her case, the evidence showed she was working on an art project at the time of the child's injury, she was using colored pencils, the child took a pencil, fell on it and injured herself, plaintiff's conduct did not demonstrate that she was not providing the care necessary for the child's well-being, the injury was the result of an isolated incident that could happen to anyone, and plaintiff had a history of being a good mother, and based on the record, the administrative law judge's decision that the Department had met its burden of proof as to the indicated finding of neglect was clearly erroneous. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09–CH–29198; the Hon. Martin S. Agran, Judge, presiding. |
| Judgment | Reversed with directions. |
| Counsel on Appeal | McDermott Will & Emery LLP (Aron J. Frakes and Michael W. Weaver, of counsel), and Diane Redleaf and Melissa L. Staas, both of Family Defense Center, both of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Laura Wunder, Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Presiding Justice Garcia and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1  Defendant, the Illinois Department of Children and Family Services (DCFS), entered an indicated finding of neglect against 17-year-old plaintiff Asia Slater in the State Central Register, based on an incident in which Asia's 7-month-old daughter fell on a colored pencil that Asia was using for a school art project, piercing her neck and puncturing her lung. Asia contested the indicated finding of neglect, seeking to have the finding expunged. After a hearing before an administrative law judge (ALJ), the ALJ determined that the preponderance of the evidence supported a finding of neglect. The ALJ recommended denial of Asia's expungement request. Defendant Erwin McEwen, Director of DCFS (Director), adopted the ALJ's recommendations and entered a final administrative decision denying Asia's request for expungement and ordering the indicated finding of neglect to remain in the State Central Register for five years. Asia sought administrative review in the circuit court, and the circuit court confirmed the Director's decision. Asia appeals, arguing: (1) the ALJ erred both in its factual findings and its decision that Asia was neglectful and (2) DCFS failed to sufficiently preserve the record of the administrative proceeding. We reverse.

¶ 2                                    BACKGROUND

¶ 3        The underlying facts in this case are not in dispute. On November 30, 2008, Asia was a 17-year-old high school student. She was the mother of a seven-month-old girl, N.S., and was N.S.'s primary caregiver. The two lived with Asia's mother, Lisa Slater. Asia was at her home working on an art project for school, which included the use of colored pencils. While Asia was working on her project, N.S. was in the same room, several feet away. At some point, N.S. took one of Asia's colored pencils from the coffee table where Asia was working. N.S. fell and the colored pencil pierced her neck. Asia took N.S. to the emergency room, where doctors discovered that the pencil had penetrated approximately three inches and had punctured the lining of N.S.'s lung.

¶ 4        After an investigation, DCFS notified Asia on or about February 20, 2009, that it was indicating a report of "Wounds by Neglect" against her. Before the pencil incident, there had been no prior indicated reports in the Child Abuse and Neglect Tracking System and there were no convictions in the Law Enforcement Agency Data System against Asia. On April 7, 2009, Asia filed an appeal of the indicated finding. On June 8, 2009, DCFS's administrative hearing unit conducted a hearing on Asia's appeal.

¶ 5        At the hearing, Asia testified that she was born on July 18, 1991, and that she gave birth to N.S. when she was 16 years old. On November 30, 2008, Asia was 17 and N.S. was 7 months old. Asia lived with her mother, Lisa, and attended high school. Asia was N.S.'s primary caregiver, but Lisa assisted in N.S.'s care. Asia attended parenting classes daily, including some on Saturdays, and had been doing so prior to N.S.'s birth. In her classes, she learned about how children develop and, in preparation for N.S.'s birth, Asia placed items "high" so that they would be inaccessible to a child.

¶ 6        As of November 30, 2008, N.S. was able to crawl and "cruise." Asia described cruising as learning to walk by standing and pulling herself along furniture, such as a coffee table. N.S. had been cruising for "a little while" but was unable to walk without supporting herself. N.S. was also able to pick up objects, such as toys, but was unable to feed herself. N.S. was verbal, saying words such as "ma-ma" but mostly "babbling." N.S. was unable to call for help in an emergency.

¶ 7        On November 30, 2008, Asia was working on an art project for school on the coffee table in her living room, sitting on the floor; she "had colored pencils out, [and] coloring books." Asia kept the colored pencils on the floor or on the table near her. N.S. was sitting at the opposite end of the table on the floor. N.S. was always in Asia's sight, no more than a few feet away. While Asia was working on her homework, N.S. was pulling herself up on the table "a lot."

¶ 8        N.S. obtained one of Asia's colored pencils. When asked how N.S. obtained the pencil, Asia testified, "Well, I didn't know that. I was cleaning up, so I don't know exactly what happened." Asia testified that "I was putting–and I looked over and I noticed that [N.S.] had done that, and I went over to her." N.S. was "[n]ot too far" from Asia and wanted to come to Asia. N.S. fell and coughed, but did not cry. When Asia picked N.S. up, she noticed a colored pencil sticking out of N.S.'s neck; the flat end was sticking out, and the pointed end was inside N.S.'s neck. The pencil was a "regular" baby blue lead pencil, approximately the

length of a pen. Asia had used the pencil earlier during her project and the tip of the pencil was "dull." N.S. was not having trouble breathing, but was coughing, and the wound was not bleeding. Asia "called out" to Lisa, who was in the bedroom taking a nap. Asia testified that after N.S. was hurt, "I didn't realize that that had happened. So I called 911, but I was pretty upset." The 911 operator was unable to understand her, so Asia had Lisa complete the phone call. N.S. was taken to Stroger Hospital with the pencil still in her neck. The pencil was removed, but N.S. required hospitalization for five days. N.S. had a punctured lung and a permanent scar from the wound.

¶ 9     When asked why she left pencils out with N.S. present, Asia testified that she was keeping the pencils close, working on her project. She took precautions of having N.S. at the opposite end of the room and kept N.S. in her sight; Asia acknowledged that she did not actually observe N.S. taking the pencil and admitted that she should have known better than to have the pencils out where N.S. would have access to them.

¶ 10     Dennis Bishop, a child protection investigator with DCFS, also testified on behalf of DCFS. He investigated the incident along with Josey Faulkner, another child protection investigator. Bishop observed N.S. on February 16, 2009, approximately six weeks after the incident, at Asia's home. Bishop testified that N.S. had a small mark from the pencil and appeared to be appropriately dressed and smiling. Bishop testified that he spoke to Asia on that occasion. She told him that on the day of the incident, she was sitting in the living room doing schoolwork. N.S. was cruising on the table, fell to the floor, and leaned to the side, at which point the pencil lodged in her neck. Asia told Bishop that the pencil was on top of the coffee table and that N.S. "somehow grabbed it."

¶ 11     Bishop also testified that after the investigation, a report was issued containing an indicated finding for "Allegation No. 57," which was an indication for neglect. Bishop testified that in order to indicate someone for neglect, it needed to be shown that the minor's injuries were a direct result of the perpetrator's neglectful acts. In Asia's case, Bishop testified that "we felt that they failed to protect the minor by failing to insure that there [were] [no] object[s] that the minor could grasp. And so she was indicated. Had the mother prevented that, then the minor would not have had that accident." Bishop opined that Asia was blatantly disregarding her parental responsibilities because she was aware that N.S. was physically able to cruise and it was not the first time that N.S. had cruised; he opined that "[n]atural mother should have been able to make sure that there were no objects where the minor could harm herself" and that the situation was inevitable.

¶ 12     Lisa, Asia's mother, testified on Asia's behalf. Lisa testified that Asia was a "great mom" and educated herself about being a parent. Lisa testified that Asia kept sharp objects and small objects away from N.S. and locked away cleaning fluid and other items in a cabinet. Lisa testified that on the day of the incident, she was in bed, sick with the flu. She heard a noise and asked if everything was all right. When she received no response, she left her bed and observed Asia holding N.S. and saying that everything was fine. Lisa went back to bed but after a few seconds, Asia told Lisa that " '[s]omething's wrong with the baby.' " Asia ran toward Lisa, saying that N.S. was unable to breathe, and gave N.S. to Lisa. Lisa assumed that N.S. had something in her throat and attempted the Heimlich maneuver, which was unsuccessful. Asia told Lisa that N.S. had something in her neck; when Lisa turned N.S., she

observed a pencil embedded in her neck. N.S. was breathing, not crying, but appeared "very grayish-pale." N.S. never lost consciousness, but appeared to be "getting a little bit sleepy." Asia called 911 but was in shock and became hysterical, so Lisa took the telephone and explained the situation. N.S.'s father, Dionete Dotson, was also called and came to the home. When N.S. was released from the hospital, she was released into the custody of her father.

¶ 13 Lisa testified that at the hospital, Asia told her about the incident. Asia had her work spread out, since she was working on a school project. She was using colored pencils as part of the project. Asia observed N.S. pick up a pencil and called out to her. Lisa testified that "when you call out to [N.S.], she will try to beat you. She knows that you want something or you see her doing something wrong." N.S. turned to run from Asia, tripped, and fell. Lisa believed that Asia was unaware that N.S.'s neck had been pierced until later.

¶ 14 Lisa testified that since the incident, Asia became "more mindful" and continued to improve her parenting skills. She testified that N.S. was "doing great."

¶ 15 Rosaura Maldonado, a case manager with Catholic Charities who worked at several high schools to assist girls with child-related services, also testified on Asia's behalf. Maldonado testified that Asia was an active participant in her group, where they discussed child development topics and parenting skills. Maldonado testified that Asia was a very effective and enthusiastic student, calling her "a model student" and "one of our top group participants in the program." Maldonado further testified that Asia was a good student at school, as well as being "serious about her role as a mother." Maldonado testified that a component of their group discussion was safety, and Asia was present during discussion of that topic.

¶ 16 The ALJ also admitted several exhibits into evidence. One of the exhibits included the medical records of N.S. at the hospital. The records indicated that N.S. had been impaled with the pencil on the front of her neck, just to the right of the anterior midline. The pencil was pointing downward at approximately a 45-degree angle. The records also included a note by Dr. Michele Lorand[1] stating:

> "The angle of the impalement and the fact that the pencil went through the skin with a not freshly sharpened point is certainly unusual and suspicious for abuse given the age and developmental stage of the baby as are the historical circumstances which suggest some risk factors for abuse, but it is impossible to say with certainty if this was the result of abuse/intentionally inflicted injury, or a very freak non-intentional situation. It should be noted that the depth of the injury itself in this particular area is not helpful as there is a lot of free space and easily transversed tissue once the pencil made it through the skin."

¶ 17 On July 15, 2009, the ALJ made written findings of fact and conclusions of law. The ALJ found "[t]hat a blatant disregard for parental responsibilities was demonstrated in Appellant putting out or leaving out sharp objects (multiple colored pencils for an art project put and left on the floor and table) within 'a few feet' of the infant at all times, with the Appellant's

---

[1]Dr. Lorand's signature line included a notation that she was a division chair in the pediatric department of Stroger Hospital. Other documents in the record, such as DCFS's investigative report, describe her as a "Child Protection Service Doctor."

admitted knowledge the infant could 'cruise' around." The ALJ further found that the incident was not the first time that N.S. had cruised around the coffee table; "that the danger from multiple attractively colored pencils to a cruising mobile infant was so imminent and apparent that no responsible caretaking parent would have failed to take protective action to remove the infant or to place the objects in question well beyond the infant's reach;" and that the colored pencils were easily available to N.S. The ALJ concluded that the indicating finding of "child neglect Allegation of Harm #57, Wounds," was supported by a preponderance of the evidence and recommended that Asia's request for expungement be denied. The ALJ further recommended that the Director consider amending the retention period of the report to 5 years instead of the usual time period of 20 years, based on Asia's young age and her "earnest efforts to master adequate parenting skills to meet her responsibilities to her child." On July 22, 2009, the Director issued a final administrative hearing decision and adopted the ALJ's recommendations, denying her request for expungement and ordering that the report remain on the State Central Registry for five years.

¶ 18    On August 19, 2009, Asia filed a complaint for administrative review in the circuit court of Cook County. DCFS filed its answer in administrative review, containing the record of administrative proceedings, under seal on January 7, 2010. Some time later, Asia's counsel informed DCFS's counsel that testimony was missing from the record. DCFS's counsel reviewed the tape recordings of the administrative hearing, identified the missing testimony, and amended the record with the transcript of the additional testimony, filed under seal on March 5, 2010. On April 1, 2010, the circuit court allowed the parties to file under seal an agreed bystander's report of missing testimony from the proceedings on June 8, 2009, containing additional testimony from the administrative hearing that was not included in the record or in its supplement.

¶ 19    On August 12, 2010, the circuit court issued a written opinion affirming the Director's decision. The court found that the ALJ's decision was supported by the evidence in the record, since Asia's responses of "I don't know" and "I didn't realize that that had happened" "demonstrate her lack of awareness as to what [N.S.]'s activities and surroundings were. Lacking this knowledge prevented Slater from exercising the necessary precautionary measures. Slater failed to protect [N.S.] from injury and thus demonstrated a blatant disregard of parental responsibility to keep sharp objects away from an active and inquisitive infant." The court further rejected Asia's argument that the ALJ's decision was erroneous as a matter of law, finding that "[d]ue to Slater's failure to ensure the colored pencils remained out of [N.S.]'s reach, it is not unreasonable for the Administrative Law Judge to have concluded that Slater's actions constitute blatant disregard of parental duties." Finally, the circuit court found that DCFS provided a sufficient record, noting that the Illinois Administrative Procedure Act (5 ILCS 100/1–1 *et seq.* (West 2004)) "only mandates that a record 'adequately insure the preservation of testimony' rather than expecting perfection" and that the record did not deprive Asia of her constitutional rights. This appeal follows.

¶ 20                                        ANALYSIS

¶ 21    On appeal, Asia raises three arguments in support of reversal: (1) the ALJ erred in finding

that the colored pencil that injured N.S. was sharp, (2) the ALJ incorrectly determined that Asia's conduct constituted neglect, and (3) DCFS's failure to preserve testimony from the administrative hearing violated Asia's rights.

¶ 22                    I. Abused and Neglected Child Reporting Act

¶ 23    The Abused and Neglected Child Reporting Act (the Act) (325 ILCS 5/1 *et seq.* (West 2004)) requires DCFS to maintain a central register of all cases of suspected child abuse or neglect reported and maintained under the Act. 325 ILCS 5/7.7 (West 2004). DCFS investigates all reports and classifies them as " 'indicated,' " " 'unfounded,' " or " 'undetermined.' " 325 ILCS 5/7.12 (West 2004); *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 267 (2004). A report is " 'indicated' " "if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2004). " 'Credible evidence of child abuse or neglect' means that the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Adm. Code 300.20 (2010).

¶ 24    A subject of an indicated report may request that DCFS amend the record of the report or remove the record of the report from the State Central Register. 325 ILCS 5/7.16 (West 2004). If DCFS does not do so, the subject of the report has the right to an administrative hearing within DCFS to determine whether the record of the report should be amended or removed. 325 ILCS 5/7.16 (West 2004). During the hearing, DCFS has the burden of proof in justifying the refusal to amend, expunge, or remove the record, and DCFS must prove that a preponderance of the evidence supports the indicated finding. 89 Ill. Adm. Code 336.100(e) (2010). After the hearing, the Director receives the ALJ's recommendation and may accept, reject, amend, or return the recommendation. 89 Ill. Adm. Code 336.220(a)(2) (2010). The Director's decision is the final administrative decision by DCFS. 89 Ill. Adm. Code 336.220(a)(2). If the subject of the report prevails, the report is released and expunged. 325 ILCS 5/7.16 (West 2004).

¶ 25    In the case at bar, DCFS entered an indicated finding of neglect against Asia. The Act provides definitions of when a child is considered to be abused or neglected. A " '[n]eglected child' " includes "any child who *** is not receiving the proper or necessary support or medical or other remedial care recognized under State law as necessary for a child's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter." 325 ILCS 5/3 (West 2004). Based on the Act's definitions of abuse and neglect, DCFS promulgated regulations detailing a number of child abuse and neglect allegations, "essentially defining problematic conduct." *Walk v. Department of Children & Family Services*, 399 Ill. App. 3d 1174, 1181 (2010).

¶ 26    Under the regulations, in order for DCFS to accept a report of child abuse or neglect, the person making the report must allege that the act or omission of the perpetrator caused one of a number of "allegations of harm." 89 Ill. Adm. Code 300 app. B (2010). Asia's conduct

was categorized as allegation No. 57,[2] "wounds." A wound is defined as "a gunshot or stabbing injury. Verification must come from a physician, a law enforcement officer or by a direct admission from the alleged perpetrator." 89 Ill. Adm. Code 300 app. B. Accordingly, in the administrative hearing, DCFS was required to prove by a preponderance of the evidence that N.S. sustained a wound caused by Asia's neglectful conduct.

¶ 27                                          II. ALJ's Findings

¶ 28        Turning to the merits of Asia's case, we first consider Asia's arguments concerning the ALJ's findings. The decision of the Director, which adopted the ALJ's recommendations, is an administrative decision and judicial review is governed by the Administrative Review Law (735 ILCS 5/3–101 *et seq.* (West 2008)). 325 ILCS 5/7.16 (West 2004). In the case of an administrative review action, we review the findings of the ALJ during the administrative hearing and not the decision of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006) (*per curiam*). Under the Administrative Review Law, actions to review a final administrative decision "shall extend to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3–110 (West 2008). Additionally, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3–110 (West 2008). The reviewing court is not to reweigh the evidence or make an independent determination of the facts. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009).

¶ 29                                          A. Factual Findings

¶ 30        Asia first challenges the ALJ's factual finding that the colored pencil that injured N.S. was sharp. The propriety of the agency's findings of fact will be upheld unless they are against the manifest weight of the evidence. *Kouzoukas*, 234 Ill. 2d at 463; *Marconi*, 225 Ill. 2d at 532 (*per curiam*). "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The fact that the opposite conclusion is reasonable or that the reviewing court may have reached a different outcome does not justify reversal of the administrative findings. *Abrahamson*, 153 Ill. 2d at 88. "If the record contains evidence to support the agency's decision, it should be affirmed." *Abrahamson*, 153 Ill. 2d at 88-89.

¶ 31        In the case at bar, Asia claims that the ALJ's findings of fact were against the manifest weight of the evidence because the ALJ's finding that Asia left out "sharp objects" within " 'a few feet' " of N.S. was not supported by the record. Asia argues that the "clear and undisputed evidence in the record" established that the pencil that pierced N.S.'s neck was

---

[2]"Many of the allegations of harm can be categorized as resulting from either abuse or neglect. All abuse allegations of harm are coded with a one or two digit number under 50. All neglect allegations of harm are coded with a two digit number greater than 50." 89 Ill. Adm. Code 300 app. B.

not sharp because Asia testified that the pencil was "dull" and the doctor's note indicated that the pencil was "not freshly sharpened." We agree with DCFS that the validity of the ALJ's finding should not "turn[ ] on the precise degree of 'sharpness' of the particular colored pencil that injured N.S." and cannot find the ALJ's factual finding to be against the manifest weight of the evidence. There is no dispute that the pencil was sharpened to some degree; Asia had been using the pencil to complete her schoolwork, so it could not have been an entirely unsharpened pencil. Additionally, the pencil was sharp enough to distinguish between the "flat end" and the "pointed end." Thus, there is evidence in the record that the pencil was at least somewhat sharp. We cannot find the ALJ's finding to be against the manifest weight of the evidence merely because the ALJ characterized the pencil as "sharp" instead of emphasizing that the pencil was not freshly sharpened.

¶ 32                                    B. Neglect Determination

¶ 33       Asia also argues that the ALJ's conclusion that she was neglectful was clearly erroneous because N.S.'s injury was the result of a " 'freak' accident." An administrative agency's decision on a mixed question of law and fact is reviewed for clear error. *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 (2006). This standard of review is deferential to the agency's expertise in interpreting and applying the statutes that it administers. *Schiller*, 221 Ill. 2d at 143. " '[W]hen the decision of an administrative agency presents a mixed question of law and fact, the agency decision will be deemed clearly erroneous only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed.' " (Internal quotation marks omitted.) *Schiller*, 221 Ill. 2d at 143 (quoting *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005)).

¶ 34       Initially, we note that both parties' arguments employ a definition of "neglect" that we are unable to apply. As noted, the Act provides that a " '[n]eglected child' " includes "any child who *** is not receiving the proper or necessary support or medical or other remedial care recognized under State law as necessary for a child's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter." 325 ILCS 5/3 (West 2004). DCFS's regulations categorize harm resulting from neglect and abuse into allegations, including allegation No. 57, "wounds." A wound is "a gunshot or stabbing injury. Verification must come from a physician, a law enforcement officer or by a direct admission from the alleged perpetrator." 89 Ill. Adm. Code 300 app. B.

¶ 35       DCFS's internal procedures set forth further guidelines for determining whether a person's actions constitute neglect:

> "Another important change is the way in which NEGLECT is defined and used in those allegations of harm, which may be attributable to either abuse or neglect. A child may sustain a harm (e.g., brain damage, death, etc.) because of the 'blatant disregard' of the parent or caretaker in his or her responsibility to oversee and protect the child. In such instances, the harm is the same to the child, but the cause is attributable to NEGLECT, not abuse. To constitute neglect, the allegations require that the harm to the child must have been the result of a **blatant disregard** of

parental or caretaker responsibilities.

'**Blatant disregard**' is defined as incidents where the risk of harm to the child was so imminent and apparent that it is unlikely that a parent or caretaker would have exposed the child to such obvious danger without exercising precautionary measures to protect the child from harm." (Emphasis in original.) Illinois Department of Children and Family Services Procedures 300 app. B(h).

Both parties frame their arguments around the "blatant disregard" standard for finding neglect. However, this standard is not contained in the Act or in the regulations promulgated pursuant to the Act, but is found in a document explaining DCFS's internal procedures. Neither party provides us with any authority for using a definition solely located in DCFS's procedures as the legal standard for behavior that constitutes neglect, nor is there any case law applying the "blatant disregard" standard in the context of an indicated finding of neglect. Accordingly, we analyze Asia's claim using the definition of neglect found in the Act.

¶ 36    The Illinois Supreme Court has said that neglect is the " 'failure to exercise the care that circumstances justly demand,' " and can arise from either wilful or unintentional disregard of duty. *In re N.B.*, 191 Ill. 2d 338, 346 (2000) (discussing neglect in the context of the Juvenile Court Act) (quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). Issues concerning abuse and neglect are decided on a case-by-case basis because abuse and neglect findings "rely on ' "amorphous concept[s] which cannot be defined with particularity." ' " *Walk*, 399 Ill. App. 3d at 1182 (quoting *In re Edricka C.*, 276 Ill. App. 3d 18, 26 (1995), quoting *In re B.M.*, 248 Ill. App. 3d 76, 79 (1993)).

¶ 37    In the case at bar, we find that the ALJ's determination that Asia neglected N.S. was clearly erroneous. There is no doubt that N.S. was seriously injured by one of Asia's colored pencils. However, it cannot be the case that the existence of the injury itself automatically results in a finding of neglect. Instead, the ALJ was required to determine whether N.S.'s injury was the result of Asia's neglectful conduct. See 89 Ill. Adm. Code 300 app. B.

¶ 38    As noted, the essential facts of this case are not in dispute. Asia was working on a school project involving the use of colored pencils. She was sitting on the floor, working at a coffee table, with colored pencils near her on the floor and on the table. N.S. was at the opposite end of the coffee table, a few feet from Asia. At some point while Asia was putting her pencils away, N.S. took one of the pencils and fell upon it, injuring herself. DCFS entered an indicated finding of neglect against Asia, on the basis that "we felt that they failed to protect the minor by failing to insure that there [were] [no] object[s] that the minor could grasp."

¶ 39    We cannot find that Asia's conduct demonstrated that N.S. was not receiving "care necessary for *** her well-being." 325 ILCS 5/3 (West 2004). Instead, the evidence in the record demonstrates that N.S.'s injury here is the result of an isolated incident that could happen to anyone. Asia was generally attentive to N.S., placing N.S. within her eyesight and on the other side of the coffee table, while keeping the colored pencils nearby. Nevertheless, N.S. was able to take a pencil during a moment when Asia was distracted or unaware of N.S.'s quick movements. While Asia could have made a different decision, such as completing her schoolwork on a higher table or arranging for Lisa to watch N.S. while Asia

completed her schoolwork, the evidence in the record clearly demonstrates that Asia was concerned about the whereabouts of N.S. while she was working and her history of being a good mother was not refuted. See *Lyons v. Department of Children & Family Services*, 368 Ill. App. 3d 557, 561 (2006) (reversing finding of abuse in part because "[e]ven if plaintiff's decision *** was not the correct one, it does not follow that he was guilty of abuse"). This is not a case where a mother left her child unsupervised or even a case where the mother was working with an obviously dangerous object, such as a knife. This is simply a case where Asia was using pencils near her daughter and failed to observe her daughter for a slight moment. While the resulting injury to N.S. was truly unfortunate, we cannot accept the ALJ's conclusion that merely having pencils in the same room as an infant, when the child was otherwise being supervised, is neglectful conduct. Based on the record, we are left with the definite and firm impression that a mistake has been committed and therefore find that the ALJ's decision that DCFS had met its burden was clearly erroneous.

¶ 40                                    III. Record on Appeal

¶ 41    Finally, Asia argues that DCFS failed to maintain a complete and accurate record of the administrative hearing. She claims that DCFS's failure violates the Illinois Administrative Procedure Act (5 ILCS 100/1–1 *et seq.* (West 2004)) and violates her right to due process. Since we have determined that the ALJ's decision upholding the indicated finding of neglect was clearly erroneous, we need not consider this issue.

¶ 42                                          CONCLUSION

¶ 43    The ALJ's finding that the colored pencil that injured N.S. was sharp was not against the manifest weight of the evidence. However, the ALJ's determination that Asia was neglectful was clearly erroneous. Accordingly, the indicated finding of neglect against Asia should be expunged.

¶ 44    Reversed with directions.