2021 IL App (1st) 200907-U

FIFTH DIVISION
June 18, 2021

No. 1-20-0907

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THEOPHILUS ILEVBARE, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19 CH 11830 |
| | ) | |
| DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | ) | |
| | ) | Honorable |
| | ) | Franklin U. Valderrama, |
| Defendant-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Cunningham in the judgment.

**ORDER**

¶ 1   *Held:* The decision of the Department of Children and Family Services (DCFS) denying plaintiff's request to expunge the indicated finding of neglect of a child is affirmed. DCFS's decision was not clearly erroneous. DCFS's factual findings were not against the manifest weight of the evidence. The record does not demonstrate that DCFS violated its own rules and regulations in making its indicated finding of neglect.

¶ 2   Plaintiff Theophilus Ilevbare appeals the circuit court's judgment affirming a final administrative decision to deny expungement of an indicated finding of child neglect against him from the state's central register. On appeal, he challenges the finding of child neglect, arguing the decision was clearly erroneous and that the manifest weight of the evidence, particularly the video

recording capturing the incident in question, supports a reversal. He also argues that DCFS failed to prove by a preponderance of the evidence that he committed child neglect and that DCFS failed to follow its own rules and regulations during its investigation. We affirm.

¶ 3                                    BACKGROUND

¶ 4      Plaintiff is the father of a son, L.I., born on March 30, 2017. Fabia Stafford-Ilevbare is the child's mother and plaintiff's ex-wife. Fabia has primary custody of L.I. and plaintiff has court-ordered visitation rights. They generally exchanged physical custody of the child in the parking lot or the lobby of the Hillside police station.

¶ 5      On April 6, 2019, while they were exchanging custody of L.I., plaintiff and Fabia had an altercation in the presence of the child, who was then two years old. Hillside police officer Ryan Hartline responded to the altercation and called the DCFS child abuse and neglect hotline to report the incident.

¶ 6      After investigating, DCFS concluded that there was credible evidence to support an indicated finding of child neglect against plaintiff under the Illinois Administrative Code's provision detailing an "Environment Injurious to Health and Welfare (Neglect)," which includes "situations that place a child at substantial risk of harm due to the effects of being subjected to participation in or the witnessing of the use of physical force or restraint of another." 89 Ill. Admin. Code § 300.Appendix B (Allegation #60). DCFS notified plaintiff of that determination and informed him that his name would be placed on the state's central register for five years as a result. DCFS also informed him that he could request an administrative appeal to amend or remove the finding from the central register on the grounds that it was inaccurate or was being maintained in a manner inconsistent with state law. Plaintiff requested an administrative appeal.

¶ 7 On August 1, 2019, an administrative law judge (ALJ) conducted a hearing on plaintiff's request for expungement of the indicated finding of child neglect. See 325 ILCS 5/7.16 (West 2018). DCFS presented as evidence its investigative file, the police report of the incident, and the testimony of the responding officers and a DCFS child protection specialist.

¶ 8 Officer Hartline testified that on the date of the incident, he received a dispatch detailing a domestic disturbance that occurred in the lobby of the police department. He recognized plaintiff and Fabia from previous incidents, explaining that they regularly exchanged their child in the parking lot or lobby and that officers are generally not present during the time of the exchange. Officer Hartline recalled a few instances of prior verbal altercations between plaintiff and Fabia which required the intervention of a police officer.

¶ 9 When Officer Hartline first arrived at the police station, he observed plaintiff exit the lobby with Sergeant Michael Reed. He did not personally observe the lobby altercation. Officer Hartline remained with Fabia and L.I. inside the lobby and he spoke to her about the incident. During the course of the investigation, he reviewed the video footage of the altercation, which was recorded on a security camera. The footage did not include an audio recording. He observed that plaintiff moved close to Fabia, who then pushed him away. As plaintiff continually approached her, Fabia maintained hold of the child's hand while she pushed plaintiff away. Plaintiff and Fabia continued to argue and yell at each other, requiring the dispatch officer stationed in the lobby to call for a responding officer.

¶ 10 Officer Hartline also described the contents of the police report he prepared, which included an interview with Fabia. She told him that she arrived at the police station to exchange L.I. with plaintiff and that they started to argue in the parking lot. Fabia told Officer Hartline that plaintiff spit on her in the parking lot, which upset her. Plaintiff then entered the lobby of the police

department and Fabia followed him inside with L.I. They continued arguing in the lobby. Plaintiff approached her. Fabia was afraid that he was going to hurt her and she pushed him away in response. Officer Hartline stated that he did not speak to plaintiff following the altercation.

¶ 11 Sergeant Reed testified that when he arrived at the police station, he observed plaintiff and Fabia arguing in the lobby. He was not aware of any prior domestic incidents involving plaintiff and Fabia. He separated the two, spoke with Fabia, and then escorted plaintiff outside the station. Fabia told Sergeant Reed that plaintiff had spit on her.

¶ 12 When they were outside the station, plaintiff told Sergeant Reed that he and Fabia had an argument in the parking lot. Sergeant Reed asked plaintiff if he spit on Fabia. Plaintiff responded that he "spit in her direction." Plaintiff would not admit that he spit on her, but stated that he spit in her direction. The incident escalated thereafter. Plaintiff told Sergeant Reed that Fabia struck him in the chest. Plaintiff was aggravated to the point where Sergeant Reed told him to move back and stop yelling. L.I. remained by Fabia's side inside the lobby.

¶ 13 Sergeant Reed confirmed that Officer Hartline prepared the police report of the incident and that he was the supervising officer that approved the report. He did not observe Fabia pushing or hitting plaintiff in the lobby, but reviewed the video footage of the incident. Sergeant Reed recalled that the argument in the parking lot involved L.I.'s car seat. He did not observe plaintiff spit on Fabia.

¶ 14 Yvette Booze, a DCFS child protection specialist, testified that on April 8, 2019, she was assigned to investigate the incident. She reviewed the police report and interviewed plaintiff and Officer Hartline. She did not interview the dispatcher who was on duty at the police station during the disturbance, noting that the dispatcher's input was reflected in the police report.

¶ 15    In plaintiff's interview, Booze told him that she was investigating a report of domestic violence during the exchange of L.I. Plaintiff denied the occurrence of domestic violence and told Booze that he and Fabia regularly argued during the time of handoff. On that day, he needed the car seat and Fabia had parked her car far away. He asked her to park closer to him. An argument ensued, during which Fabia hit him with two belts. He retreated inside the lobby of the station. She followed him inside, where she pushed, shoved, and yelled at him. He described his relationship with Fabia as tumultuous and that she was sometimes abusive to him. Plaintiff told Booze that Fabia had pushed him previously.

¶ 16    Next, Booze described the factors that she and her supervisor discussed and weighed when deciding to indicate a finding of child neglect. She considered the history of conduct, which included previous altercations, and the police report that stated plaintiff spit in the direction of Fabia. When asked why this conduct factored into creating an environment injurious to the child, Booze stated that "[i]f the child is present and * * * since he did admit he spit in that direction, it infuriated his ex-wife," creating "the argument that -- a contentious relationship going back and forth while the child was there. So this child was witnessing this. And it didn't escalate to a physical fight but it could have." Further, the police report indicated "a push and a shove and the child is present. He could possibly be hurt in that situation. And since [there] was a history of it and the police have reported that * * * this happens frequent[ly] and the child is there during this handoff and that's where the indication came in." In Booze's opinion, the child's proximity to the physical exchange between the parents created a risk of harm.

¶ 17    On cross-examination, Booze acknowledged that the video footage of the altercation did not show plaintiff push Fabia. The video footage also did not show plaintiff spit in the direction of Fabia. In addition, the police officer who spoke to Booze did not mention whether he observed the

altercation or spitting incident. Booze did not interview the dispatcher who witnessed the altercation in the lobby.

¶ 18    On redirect examination, Booze testified that she watched the video recording during her investigation. She recounted that the footage showed Fabia pushing plaintiff and he stumbled backward. Plaintiff approached Fabia multiple times and she continued to push him back. At no time did plaintiff attempt to leave the area. During this time, the child occasionally approached his parents and at one time during the altercation stood in between them. The child appeared to be crying. Fabia appeared to console the child and continued to push plaintiff away. Booze stated that the child could have been hurt during the altercation, even inadvertently.

¶ 19    Plaintiff testified that on the date of the incident, Fabia was 30 minutes late arriving at the Hillside police station to exchange their child. He parked close to the entrance and when Fabia arrived, she parked next to him and they spoke to each other while remaining in their cars. Plaintiff asked Fabia why she failed to notify him that she was going to be late and she became very upset. She exited her car, took two belts that sat on the front passenger seat of plaintiff's car, and hit him with the belts. The child remained in Fabia's car. Plaintiff exited his car and took the belts away from Fabia and went inside the police station "so there can be policemen when I'm being assaulted like this [to] have a witness." He stated that he entered the police station to deescalate the situation. He knocked on the glass window where the dispatcher sat and told her that he needed the police, "somebody is attacking me, my ex-wife is in the parking lot."

¶ 20    While the dispatcher called officers to the scene, Fabia walked into the lobby with the child. Plaintiff stated that he tried to tell Fabia to calm down. He stated that Fabia "dropped the child and she * * * was lunging at me." Plaintiff stated that he walked back to his position and "maintained a respectable distance from her," as supported by the video footage. Plaintiff claimed that Fabia

tried to grab him by the neck and that she continued to lunge at him. He stated that he tried to "back off to mitigate the defense on myself * * * [a]nd, unfortunately, I think I did not exercise my right to self-defense. You know, looking back now, I have no regrets * * * because the problem is especially [involving] domestic issues, as a man, if you try to defend yourself unless somebody tr[ies] to strike you and then you defend yourself like this, her hand hit[s] you, then she will say that you hit her when -- you know, whenever the police come." In plaintiff's assessment, the situation in the lobby was not two people fighting with each other, but rather Fabia fighting him. He stated that the video footage "speaks for itself."

¶ 21    On cross-examination, plaintiff acknowledged that he continued to approach and confront Fabia in the lobby instead of deescalating the situation. Plaintiff stated that "there is no law anywhere that says you cannot stand in close proximity to anyone. There is no incitement." He did not leave the lobby. He stated that Fabia should have waited outside for the officers to arrive. Plaintiff was aware of the security camera recording the incident in the lobby as it unfolded and stated that he made Fabia aware of the same. Plaintiff stated that he did not spit on Fabia and that the police officer did not witness the incident, "[s]o that was just hearsay." Plaintiff acknowledged that Fabia told a police officer that he had spit at him. He also stated that during the altercation in the lobby, "the child was not in the middle of it." The video footage showed that Fabia "was the one who was verbally aggressive," while he "took all of the steps." Finally, plaintiff acknowledged that Booze's assessment upon seeing the footage was that he confronted Fabia after she pushed him.

¶ 22    On September 12, 2019, the ALJ issued a decision finding that plaintiff was a perpetrator of child neglect as defined under allegation of harm #60, which details "Environment Injurious to Health and Welfare." The ALJ concluded that DCFS met its burden of proof under a

preponderance of the evidence for the indicated finding of neglect. The ALJ recommended that plaintiff's request to expunge the indicated finding of child neglect from the state's central register be denied. The ALJ explained the decision as follows:

> "The testimony was clear that the appellant did not push or shove Ms. Stafford-Ilevbare while they were in the lobby, although testimony was that the appellant did spit on Ms. Stafford-Ilevbare while they were in the parking lot. If we want to consider that the appellant might be the non-offending party we also need to determine whether the appellant exercised precautionary steps to prevent or mitigate the risk of harm to [the child]. In the absence of any other evidence presented it is clear from the video that the appellant did nothing to prevent or mitigate the risk of harm to L.I. The video recording showed how the appellant kept arguing with Ms. Stafford-Ilevbare and kept getting in her face so that she continued to physically attack him. Both parents failed to take measures to prevent or mitigate L.I.'s exposure to their physical altercation and their obvious hostility toward each other."

¶ 23    On September 25, 2019, the acting director of DCFS issued a final administrative decision adopting the ALJ's factual findings and legal conclusions. The acting director concurred with the ALJ's recommendation that plaintiff's request for the expunction of the record of allegation of harm #60 be denied.

¶ 24    Plaintiff filed a complaint for administrative review in the circuit court, seeking reversal of the acting director's final decision. After reviewing the complaint, administrative record, and the parties' memoranda, the court entered an order affirming the acting director's final decision. This appeal followed.

¶ 25                                    ANALYSIS

¶ 26    Plaintiff argues on appeal that: (1) the ALJ's finding that he committed child neglect was clearly erroneous; (2) the ALJ's factual findings were against the manifest weight of the evidence; (3) DCFS disregarded its own rules and regulations to determine its indicated finding of neglect; and (4) DCFS failed to meet its burden of proof establishing child neglect under allegation of harm #60.

¶ 27    Under the Illinois Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/1 *et seq.* (West 2018)), "DCFS maintains a central register of all reported cases of suspected child abuse or neglect." 325 ILCS 5/7.7 (West 2018). *Plowman v. Department of Children and Family Services*, 2017 IL App (1st) 160860, ¶ 14. "When DCFS investigates a report of neglect, it must determine whether the report is 'indicated,' 'unfounded,' or 'undetermined.' " *Id*. (citing 325 ILCS 5/7.12 (West 2014)). Under section 3 of the Act, a report is "indicated" if "an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2018). DCFS enters an indicated report into the state's central register. 325 ILCS 5/7.12 (West 2018).

¶ 28    Plaintiff in this case, who is the subject of an indicated report, has the right to an administrative appeal and to request that the report be expunged. 325 ILCS 5/7.16 (West 2018). "DCFS has the burden of proof in justifying its refusal to expunge the indicated report and must prove that a preponderance of the evidence supports the indicated finding." *Plowman*, 2017 IL App (1st) 160860, ¶ 15 (citing 89 Ill. Admin. Code § 336.100(e) (2000) (repealed)); see now 89 Ill. Admin. Code § 336.115(c)(2)(B) (eff. Dec. 6, 2017) ("the Department must prove that a preponderance of the evidence supports the indicated finding"). After a hearing, the ALJ makes a recommendation to the DCFS director, who may accept, reject, amend, or return the recommendation. *Id*. (citing 89 Ill. Admin. Code § 336.220(a) (2005)). "The director's decision is

the final administrative decision, review of which is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014))." *Id.* The circuit court has jurisdiction to review final administrative decisions, from which a party may appeal to this court. *Id.* "This court, however, reviews the decision of the agency and not the circuit court." *Id.* This court does not reweigh the evidence, judge the credibility of witness testimony, or substitute its judgment for that of the agency. *Id.* ¶ 24.

¶ 29    Section 4 of the Children and Family Services Act grants DCFS the authority "[t]o make all the rules necessary for the execution of its powers." 20 ILCS 505/4 (West 2018). "Pursuant to this authority, DCFS has promulgated rules for the enforcement and administration of the [Act]." *Plowman*, 2017 IL App (1st) 160860, ¶ 17. Relevant here, DCFS promulgated Appendix B, which describes the specific incidents of harm that must be alleged to have been caused by the acts or omissions identified in section 3 of the Act before DCFS will accept a report of child neglect. See 89 Ill. Admin. Code § 300.Appendix B, amended at 38 Ill. Reg. 13214 (eff. June 11, 2014). "The regulations categorize the incidents of harm into numbered 'allegations.' " *Plowman*, 2017 IL App (1st) 160860, ¶ 17. The allegation at issue in this case, allegation of harm #60, addresses the existence of an environment injurious to the health and welfare of the child. 89 Ill. Admin. Code § 300.Appendix B (Allegation #60).

¶ 30    Appendix B "describes the specific incidents of harm which must be alleged to have been caused by the acts or omissions of the persons identified in Section 3 of the [Act] before [DCFS] will accept a report of child abuse or neglect." *Id.* Section 3 of the Act defines a "neglected child" as, among other things, one who "is subjected to an environment which is injurious insofar as (i) the child's environment creates a likelihood of harm to the child's health, physical well-being, or welfare and (ii) the likely harm to the child is the result of a blatant disregard of parent, caretaker,

or agency responsibilities." 325 ILCS 5/3 (West 2018). Under the Act, "blatant disregard" means "an incident where the real, significant, and imminent risk of harm would be so obvious to a reasonable parent or caretaker that it is unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures to protect the child from harm." *Id*. Echoing the Act's definition of "neglected child," allegation of harm #60 provides that an injurious environment exists when "a child's environment creates a likelihood of harm to the child's health, physical well-being or welfare and that the likely harm to the child is the result of a blatant disregard of parent or caretaker responsibilities." 89 Ill. Admin. Code § 300.Appendix B (Allegation #60). Further, "[t]his allegation shall be used when the type or extent of harm is undefined, but the totality of circumstances, including inculpatory and exculpatory evidence, leads a reasonable person to believe that the child's environment may likely cause harm to the child's health, physical well-being or welfare due to the parent's or caretaker's blatant disregard." *Id*. Allegation of harm #60 defines "blatant disregard" as provided in section 3 of the Act. *Id*.

¶ 31    In addition, allegation of harm #60 details examples of conditions that may create the contemplated risk of harm. For example, domestic violence may trigger allegation of harm #60:

> "An incident of past or current domestic violence may qualify for an allegation of environment injurious if the domestic violence creates a real, significant and imminent risk of moderate to severe harm to the child's health, physical well-being, or welfare, and the parent or caregiver has failed to exercise reasonably precautionary measures to prevent or mitigate the risk of harm to the child." *Id*.

¶ 32    Allegation of harm #60 also lists the factors to be considered when determining if child neglect is indicated, including, among other things, the child's age, medical condition, the severity of the occurrence, previous history of indicated abuse or neglect, and the precautionary measures

exercised by the parent to protect the child from harm. *Id*. "All factors need not be present to justify taking the report," and "[o]ne factor alone may present sufficient danger to justify taking the report." *Id*.

¶ 33    Ultimately in this case, the acting director adopted the findings of the ALJ and determined that plaintiff placed L.I. in an environment injurious to the child's health and welfare within the meaning of allegation of harm #60. That determination involved a mixed question of fact and law. *Plowman*, 2017 IL App (1st) 160860, ¶ 27. Thus, we review whether the acting director's decision was clearly erroneous. *Id*. An agency's decision will be deemed clearly erroneous only when the reviewing court, on the entire record, "is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). This standard of review "is significantly deferential to an agency's experience in construing and applying the statutes that it administers." *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 (2006). With this legal framework in mind, we address plaintiff's arguments.

¶ 34                    Whether the ALJ's Findings Were Clearly Erroneous

¶ 35    Plaintiff first argues that the ALJ's findings were clearly erroneous because he was not an "eligible perpetrator" under 89 Ill. Admin. Code § 336.20 for purposes of finding child neglect. He contends that DCFS was required to show that the person indicated was a "person responsible" for the care of the child at the time of the alleged neglect. He argues that Fabia was the person responsible for the care of L.I. at the time she allegedly assaulted him in the lobby of the Hillside police station. His parental responsibility only began at the point of "peaceful physical exchange of the child by hand from Fabia to [him]." He claims that Fabia "created a substantial risk of

physical injury to the child" by repeatedly assaulting plaintiff. Further, he contends that he "exercised precautionary measures to protect the child from harm" by leaving the parking lot and entering the lobby of the police station to seek assistance. He also argues that the environment could not have been "injurious" under section 3 of the Act because the exchange occurred at a police station, which he considered to be a safe location.

¶ 36    In this case, the ample evidence presented by DCFS supports the acting director's final decision, as recommended by the ALJ, that plaintiff created an injurious environment under allegation of harm #60. The ALJ considered the video footage of the altercation in the police station's lobby and heard testimony of the officers responding to the incident, the DCFS child protection specialist assigned to investigate the case, and plaintiff. Plaintiff admitted to Sergeant Reed that he spit in the direction of Fabia while he argued with her in the parking lot. Fabia told Officer Hartline that plaintiff spit on her, causing an escalation. When the altercation moved into the lobby, plaintiff continued to approach Fabia instead of mitigating or deescalating the situation. During this time, L.I. stood next to his mother and sometimes between his parents as the physical altercation continued. This environment created "a likelihood of harm to the child's health, physical well-being or welfare and * * * the likely harm to the child [was] the result of a blatant disregard" of the parents' responsibilities, Fabia's conduct notwithstanding. 89 Ill. Admin. Code § 300.Appendix B (Allegation #60). Here, the conditions created a real, significant, and imminent likelihood of harm to the child's health, well-being, or welfare and plaintiff, the parent, blatantly disregarded his parental responsibility by failing to exercise reasonable precautionary measures to prevent or mitigate the imminent risk of moderate to severe harm. *Id.* The existence of an injurious environment includes "situations that place a child at substantial risk of harm due to the effects of being subjected to participation or the witnessing of the use of physical force or restraint of

another." *Id*. Here, the video footage shows the child being subjected to participation or witnessing the use of physical force of another when a physical altercation ensued between his parents in his presence. We agree with the administrative agency's decision that the indicated finding of child neglect was consistent with allegation of harm #60's provision that the incident of domestic violence created a real and significant risk of harm to a child, and that plaintiff, as a parent, had not taken reasonable mitigating measures. We thus find substantial support for the agency's finding that the altercation constituted an injurious environment.

¶ 37    On this entire record, plaintiff has not established with definite and firm conviction that a mistake has been committed. We find the final decision of the DCFS acting director was not clearly erroneous.

¶ 38    Nevertheless, we briefly address each of plaintiff's arguments in this section of his brief. Plaintiff attempts to absolve himself of his responsibility as the parent of L.I. during the exchange of custody because, in his opinion, Fabia had not completed the exchange. Section 3 of the Act defines a "[p]erson responsible for the child's welfare" as the child's parent. 325 ILCS 5/3 (West 2018). Despite his attempts to claim otherwise, plaintiff, as the father of L.I., is a "[p]erson responsible for the child's welfare" under the Act.

¶ 39    Plaintiff also argues that he mitigated the situation by entering the police station lobby. Conveniently, he withheld the fact that he spit in Fabia's direction in the parking lot immediately before he entered the lobby, which instead aggravated the situation. He further inflamed the lobby altercation by continuing to approach Fabia instead of waiting outside for police officers to arrive.

¶ 40    Finally, he contends he did not subject L.I. to an injurious environment because the altercation occurred at a police station. Plaintiff argues that the safety of a police station does not fit the language of injurious environment under section 3 of the Act. The video footage belies

plaintiff's argument on this point. Whether the altercation occurred in a police station or elsewhere is inconsequential. The issues are whether the "child's environment creates a likelihood of harm to the child's health, physical well-being, or welfare," and whether "the likely harm to the child is the result of a blatant disregard" of the parent. *Id*. A physical altercation between the parents in the immediate presence of the child, which is what occurred here, creates a likelihood of harm to the child and shows that the likelihood of that harm is the result of a blatant disregard of the parent, which in this case is plaintiff. We reject plaintiff's arguments that the administrative agency's decision was clearly erroneous.

¶ 41      Whether the ALJ's Findings Were Against the Manifest Weight of the Evidence

¶ 42      Plaintiff next argues that the ALJ's findings of fact were against the manifest weight of the evidence. He denied that he spit on Fabia and that he and Fabia were mutual combatants. He argues that DCFS falsely claimed that he did not take steps to mitigate the evidence. He contends Fabia should have waited outside the police station instead of entering the lobby, where she allegedly committed "a savage and ferocious attack" on him.

¶ 43      In raising these arguments, plaintiff essentially asks us to substitute our judgment for that of the trier of fact by reweighing the evidence and drawing our own conclusion as to the credibility of the witnesses. That is not the function of this court, however, as it is the province of the administrative agency to determine the credibility of the witnesses and resolve conflicts in the evidence. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006). The findings and conclusions of an administrative agency on questions of fact are held to be *prima facie* true and will not be disturbed on review unless they are against the manifest weight of the evidence. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. An administrative agency's decision is against the manifest weight of the

evidence only if the opposite conclusion is clearly evident. *Slater v. Department of Children and Family Services*, 2011 IL App (1st) 102914, ¶ 30.

¶ 44   Again, DCFS presented abundant evidence supporting the ALJ's finding that plaintiff committed child neglect under allegation of harm #60. Although plaintiff's testimony contradicted that of the testifying officers and the DCFS child protection specialist, the ALJ made her findings of fact after receiving all the evidence and observing the witnesses. It is well-established that " '[c]onflicts in witness testimony do not constitute a sufficient reason to reverse an administrative agency's decision, since the agency's responsibility is to resolve the conflicting evidence.' " *Orsa v. Police Board*, 2016 IL App (1st) 121709, ¶ 47 (quoting *Collura v. Board of Police Commissioners*, 135 Ill. App. 3d 827, 839 (1985)). Further, the fact that an opposite conclusion is reasonable or that the reviewing court may have reached a different outcome does not justify the reversal of the administrative findings. *Slater*, 2011 IL App (1st) 102914, ¶ 30. "If the record contains evidence to support the agency's decision, it should be affirmed." *Id.* (citing *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88-89 (1992)). In this case, the ALJ reviewed the evidence, including the video footage of the incident, and the record supports her findings that the agency's decision was not against the manifest weight of the evidence.

¶ 45                Whether DCFS Exceeded Its Rule-Making Authority

¶ 46   Plaintiff next contends that DCFS disregarded its own rules and regulations, upon which it based its indicated finding of neglect against him. Plaintiff argues that he was the victim of an aggravated domestic battery and that DCFS ignored the video footage of Fabia attacking him. He contends DCFS failed to properly consider all the exculpatory evidence and that DCFS deliberately concealed that evidence to fabricate its report. Plaintiff, however, fails to provide any evidence or legal argument supporting these claims, other than making broad accusations against DCFS of

wrongdoing. Plaintiff again is asking this court to substitute our judgment for that of the trier of fact by reweighing the evidence and considering "exculpatory evidence" that he failed to present during the hearing. It is not the function of this court to reweigh the evidence. *Marconi*, 225 Ill. 2d at 540. We decline to do so here because it is the province of the administrative agency to determine the credibility of witnesses and resolve conflicts in the evidence. *Id*. As the record does not establish that this evidence was before the ALJ, plaintiff's reliance on it is unavailing and does not negate other evidence establishing the agency's finding that he committed child neglect under allegation of harm #60.

¶ 47    Whether DCFS Met Its Burden of Proof Under a Preponderance of the Evidence

¶ 48    Finally, plaintiff argues that DCFS failed to meet its burden of proof that he committed child neglect. He contends that the ALJ allowed testimony from police officers who did not witness the altercation, which prejudiced him. He also claims the circuit court "did nothing" when he tried to claim Fabia perpetrated domestic violence.

¶ 49    In an administrative hearing regarding a child neglect finding, DCFS has the burden of proof justifying the refusal to amend, expunge, or remove the record and must prove that a preponderance of the evidence supports the indicated finding. 89 Ill. Admin. Code § 336.115(c)(2)(B) (eff. Dec. 6, 2017). Here, the DCFS acting director accepted the ALJ's finding that plaintiff was a perpetrator of child neglect under allegation of harm #60 and her recommendation that plaintiff's request to expunge the indicated finding of neglect should therefore be denied.

¶ 50    Under allegation of harm # 60, examples of incidents that can cause a substantial risk of physical injury include "[s]ubjecting the child to participation in or witnessing the physical abuse or restraint of another person when it is used by the perpetrator to intimidate the child." 89 Ill.

Admin. Code § 300.Appendix B (Allegation #60). Also, examples of circumstances that may create real, significant and imminent risk of moderate to sever harm include "situations that place a child at substantial risk of harm due to the effects of being subject to participation in or the witnessing of the use of physical force or restraint of another," particularly during incidents of domestic violence. *Id.*

¶ 51 In this case, the evidence clearly showed that plaintiff exposed his child to a substantial risk of harm when L.I. witnessed the altercation in the police station lobby. The police officers' testimony supports the ALJ's findings of neglect, particularly considering plaintiff inflamed the situation when he spat in the direction of Fabia in the parking lot, which apparently led to the altercation in the lobby. The evidence also demonstrated that plaintiff did nothing to mitigate the incident in the lobby and instead continued to aggravate the physical altercation by repeatedly approached Fabia. The altercation in the lobby occurred in the immediate presence of L.I., who stood either next to or between his parents as Fabia repeatedly pushed plaintiff away, exposing the child to a "substantial risk of harm." Fabia's conduct during the altercation in no way mitigated plaintiff as a "[p]erson responsible for the child's welfare." 325 ILCS 5/3 (West 2018). The crux of the evidence shows plaintiff blatantly disregarded the welfare of his child such that a finding of neglect was appropriate under the circumstances. Indeed, during the administrative hearing, plaintiff specifically testified, "You know, looking back now, I have no regrets * * * because the problem is especially [involving] domestic issues, as a man, if you try to defend yourself unless somebody tr[ies] to strike you and then you defend yourself like this, her hand hit[s] you, then she will say that you hit her when -- you know, whenever the police come."

¶ 52 We find DCFS met its burden of proof to show that plaintiff had placed L.I. "at a substantial risk of harm due to the effects of being subjected to participation in or the witnessing of the use of

physical force or restraint of another." 89 Ill. Admin. Code § 300.Appendix B (Allegation #60). We therefore affirm the findings of the ALJ and the decision of the DCFS acting director denying plaintiff's request to expunge the indicated finding of neglect from the state's central register.

¶ 53                                            CONCLUSION

¶ 54     We affirm the judgment of the circuit court of Cook County affirming the administrative agency's decision and its denial of plaintiff's request to expunge the indicated finding of neglect from the state's central register.

¶ 55     Affirmed.