# Illinois Official Reports

## Appellate Court

---

### *Shilvock-Cinefro v. Department of Children & Family Services*,
### 2014 IL App (2d) 130042

---

| | |
|---|---|
| Appellate Court Caption | KAREN SHILVOCK-CINEFRO, Plaintiff-Appellant, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-13-0042 |
| Filed | January 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's judgment upholding the denial by the Department of Children and Family Services of plaintiff's request for the expungement of an indicated report of child abuse in connection with a child with behavioral problems she adopted was reversed, since there was no evidence that any abuse occurred for purposes of section 3(b) of the Abused and Neglected Child Reporting Act. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 12-MR-79; the Hon. Michael T. Caldwell, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Rebecca M. Lee, of Gummerson Rausch Wand Lee Wombacher, LLC, of Woodstock, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Sharon A. Purcell, Assistant Attorney General, of counsel), for appellee. |

Panel JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Birkett and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff, Karen Shilvock-Cinefro, appeals the trial court's judgment upholding an order of the Illinois Department of Children and Family Services (the agency) that denied her request for the expungement of an indicated report of child abuse. We reverse because there was no evidence that abuse occurred under section 3(b) of the Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/3(b) (West 2010)).

¶ 2           I. BACKGROUND

¶ 3 On November 22, 2011, the agency entered on the central register an indicated report of abuse for allegation of harm No. 14, tying/close confinement, based on an incident in which plaintiff used duct tape, a sheet, and rope to restrain her adopted deaf child, N.C., in a vehicle in order to transport her to a hospital for assistance with behavioral problems. Plaintiff filed a request to expunge the report, and a hearing was held.

¶ 4 With the exception of the use of rope as a restraint, the facts are not in dispute. Plaintiff is a social worker and a licensed nursing home administrator, with a bachelor's degree in psychology and a master's degree in sociology and gerontology. Plaintiff and her husband have four biological children and, including N.C., three children adopted from China. Plaintiff home-schools the four youngest children.

¶ 5 Plaintiff and her husband became interested in adopting N.C. when they saw her on a video from a Chinese orphanage. They could tell that she was hearing impaired and they had previously adopted a hearing-impaired child from China. They believed that N.C. should be adopted before she turned 14, because, at that time, she would age out of the orphanage. N.C. had originally been found at a bus station in China when she was around six years of age, and she had been in the orphanage for eight years. Although her birth date based on Chinese records placed her at around 14 years of age, a later dental exam estimated that she might be two or three years younger. At the time of the events at issue, N.C. was around 5 feet tall and weighed 70 to 80 pounds. N.C. did not speak, although there was evidence that she knew some limited sign language and had some writing skills. N.C. had been given hearing aids, and plaintiff arranged for her to be further evaluated for the possibility of cochlear implants. N.C. was also severely nearsighted, and plaintiff got her new glasses.

¶ 6 In June 2011, plaintiff, her husband, and two of her biological children traveled to China to get N.C. When they arrived, they learned that N.C. spent weekdays at a rehabilitation institute and returned to the orphanage on weekends. While they were in China, N.C. exhibited behavioral problems. In one instance, she purposely attempted to walk in front of an oncoming vehicle, and plaintiff's husband grabbed her and pulled her out of the way. In another instance, N.C. ran up behind plaintiff's husband and rammed an umbrella into his buttocks. She also bit plaintiff and hit plaintiff's husband. During the plane trip back to the United States, N.C. refused to stay in her seat, pinched plaintiff's husband, and was difficult to control.

¶ 7 After arriving in the United States, N.C. continued to have behavioral problems, including throwing a lamp at plaintiff, spitting, screaming, and crying, and scratching and biting herself. N.C. also took off her seatbelt while in the family's van, causing plaintiff to get in the backseat and hold her hands. On other occasions, N.C. bit plaintiff, plaintiff's husband, and one of the other children, causing bruises. One of plaintiff's other children was afraid of N.C. During the incidents, plaintiff would try to comfort N.C. by rubbing her head and arms. Plaintiff would use timeouts or hold her. She also would hold her to prevent her from scratching herself. There was evidence that the family had been trying to obtain help for N.C.'s behavioral problems. Plaintiff said that she was overwhelmed by N.C. at times.

¶ 8 The incident leading to the finding of abuse occurred on August 29, 2011. On that day, N.C. created a disruption by banging her pencil box on a table. Plaintiff sent N.C. to her room, where she pounded on the wall and yelled until she became quiet and took a nap. Plaintiff later woke up N.C. in order to take her and three of the other children to a learning center. N.C. began to yell, refused to put on her shoes, and screamed and kicked. Plaintiff was able to get N.C. to the van and into one of the seats. N.C. then began to kick, yell, spit, and scratch herself. Plaintiff asked the other children to exit the van. Plaintiff held N.C. for around 10 minutes, but N.C. did not calm down, and plaintiff did not think she could get her back into the house for another timeout.

¶ 9 Plaintiff said that N.C. was out of control, that the situation was very intense, and that N.C. was more violent than she had ever seen her. Plaintiff had previously discussed with others the need to get N.C. help if a particularly bad outburst occurred, and she decided to take N.C. to the hospital for help. She had also discussed the need to keep N.C. safe in a car if N.C. could cause a distraction to the driver. She said that she had previously discussed with a therapist the possibility of needing to restrain N.C., but that tying was not specifically mentioned. That therapist, however, told an investigator that she did not discuss tying or confining N.C. with plaintiff. Plaintiff did not wish to call 911, because in the past her family had problems with the hospital that the ambulance service would use. She also was concerned that N.C. was fearful of ambulances and that paramedics strapping her down would be very traumatic.

¶ 10 Because N.C. had previously attempted to get out of the van during outbursts, plaintiff used a sheet and duct tape that were already in the van to restrain N.C. to the seat. Plaintiff believed that the restraint was necessary in order to safely transport N.C. to the hospital. Plaintiff put duct tape over the sheet and N.C.'s clothing but, because N.C. was kicking and flailing around, some of the tape stuck on her arms and legs. Plaintiff wrapped tape around N.C.'s middle and elbow areas twice and around her legs at the knees two or three times. She used a nylon belt to

restrain N.C.'s wrists. In addition, plaintiff placed a piece of duct tape on N.C.'s upper lip to prevent her from spitting, but she left it loose and did not cover N.C.'s mouth with it. She described it as a 1½-inch flap and said that N.C.'s breathing was not restricted or obstructed. The trip to the hospital took about 25 minutes. During the trip, plaintiff pulled over twice and checked the tape because N.C. was violently kicking the center console, was trying to open the door, and had slid down in her seat. Plaintiff said that she drove responsibly to the hospital and she denied using rope to restrain N.C. She said that there was rope in the van and that, during the trip, N.C. picked it up and swung it like a whip. Plaintiff admitted that she had never seen duct tape used as a method of restraint and was familiar with other forms of restraint. She also said that she did not think she could have safely driven N.C. to the hospital using other methods.

¶ 11    When plaintiff arrived at the hospital, she parked at the emergency room entrance and went inside to seek assistance. Wendy Mitchell, an emergency room nurse, and Matt Randow, a hospital security guard, assisted in removing N.C. from the van. Randow reported that N.C. had tape around her wrists, legs, chest, and waist, a sheet around her waist, and rope tied around her legs and waist. Mitchell reported that N.C. was secured to the seat with duct tape around her shoulders, arms, abdomen, thighs, and calves. Mitchell said that N.C.'s wrists and ankles were tied with a rope and that she was crying. Trauma shears, which are like large heavy-duty scissors, were used to cut through the duct tape. It took around three to five minutes to remove N.C. from the van. Mitchell testified that she did not think the restraint was proper and that, had there been an accident on the way to the hospital, N.C. would have been in danger because she would have been unable to free herself from the van.

¶ 12    Tape residue was found on N.C.'s shoulder, mouth area, thighs, and shins. A physical examination showed minor abrasions caused by the removal of the duct tape. N.C. was not diagnosed with any other injuries as a result of the restraint. There was no evidence of any serious physical consequences.

¶ 13    The hospital staff notified the authorities, and the agency received a report. An investigating police officer observed tape residue on N.C.'s chin area and cheeks. The officer reported that plaintiff said that she used rope when she restrained N.C. in the van. The officer opined that plaintiff was completely overwhelmed during the incident, but she stated that her investigation of plaintiff's home revealed no red flags. The other children corroborated plaintiff's account of the incident. One reported that plaintiff yelled at N.C. when she acted out but never spanked her. There was no evidence that plaintiff ever restrained any of the other children, and all of them denied ever being restrained by plaintiff.

¶ 14    An agency investigator reported that she saw N.C. in the hospital and that N.C. was eating and smiling. Plaintiff told agency investigators about the incident in a manner that was generally consistent with her testimony. She told them that she believed her actions were the best way to keep N.C. safe and that she had tried to calm N.C. down first through less restrictive measures.

¶ 15    After her discharge, N.C. was taken into protective custody. On September 14, 2011, she was diagnosed with acute adjustment disorder with disturbance of conduct, posttraumatic stress disorder, and attention deficit hyperactivity disorder. She was provided with medication.

There was no evidence that criminal charges were ever brought against plaintiff. On September 27, 2011, N.C. was discharged to plaintiff's home, and a caregiver was hired. On November 17, 2011, a social worker determined that N.C. was healthy, well cared for, and comfortable in plaintiff's home. Her adoption was finalized in 2012.

¶ 16    The agency argued that abuse was shown because the restraint was unreasonable under the Illinois Administrative Code (Code) (89 Ill. Adm. Code 300.Appendix B (Allegation No. 14) (2011)). Plaintiff argued that abuse must also be shown under section 3(b) of the Act, which requires a showing of a substantial risk of physical injury, by other than accidental means, that would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function. 325 ILCS 5/3(b) (West 2010).

¶ 17    The administrative law judge (ALJ) denied the request for expungement, and the agency adopted the ALJ's recommendation. In the order, the ALJ focused on the use of rope, finding that plaintiff lacked credibility because she testified that she did not tie N.C. with rope but had previously told an officer that she did so and there was other evidence of the use of rope. The ALJ found that plaintiff unreasonably restricted N.C.'s movement when, as Mitchell observed, N.C. was tied in the vehicle and unable to free herself. The ALJ did not address whether there was a substantial risk of physical injury caused by the restraint. Plaintiff appealed to the trial court, which affirmed. She now appeals to this court.

¶ 18                                    II. ANALYSIS

¶ 19    Plaintiff argues that the agency failed to establish abuse because it failed to present evidence that the restraint caused a substantial risk of physical injury, as required by section 3(b) of the Act. She also argues that the ALJ's finding that the restraint was unreasonable was clearly erroneous.

¶ 20    The Act requires the agency to maintain a central register of all cases of suspected child abuse or neglect reported and maintained under the Act. 325 ILCS 5/7.7 (West 2010). The agency investigates all reports and classifies them as " 'indicated,' " " 'unfounded,' " or " 'undetermined.' " 325 ILCS 5/7.12 (West 2010); *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 23. A report is "indicated" when an investigation determines that credible evidence of the alleged abuse or neglect exists. 325 ILCS 5/3 (West 2010). Credible evidence of abuse or neglect is found when the available facts, viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected. 89 Ill. Adm. Code 300.20, amended at 35 Ill. Reg. 1599 (eff. Jan. 15, 2011).

¶ 21    A subject of an indicated report may request the agency to amend the record of the report or to remove the record of the report from the central register. 325 ILCS 5/7.16 (West 2010). If the agency refuses a request, the subject of the report has the right to an administrative hearing before an ALJ to determine whether the record of the report should be amended or removed. 325 ILCS 5/7.16 (West 2010). The agency has the burden of proof in justifying the refusal to amend or remove the record, and it must prove that a preponderance of the evidence supports the indicated finding. *Slater*, 2011 IL App (1st) 102914, ¶ 24. After the hearing, the director of

the agency receives the ALJ's recommendation and may accept, reject, amend, or return the recommendation. *Id*. The director's decision is the final administrative decision. *Id*.

¶ 22    Judicial review of the director's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)). 325 ILCS 5/7.16 (West 2012). "In the case of an administrative review action, we review the findings of the ALJ during the administrative hearing and not the decision of the circuit court." *Slater*, 2011 IL App (1st) 102914, ¶ 28.

¶ 23    "The propriety of the agency's findings of fact will be upheld unless they are against the manifest weight of the evidence." *Id*. ¶ 30. An agency's application of the law to the facts presents a mixed question of law and fact. See *Lake County Board of Review v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 120429, ¶ 8. "An administrative agency's decision on a mixed question of law and fact is reviewed for clear error." *Slater*, 2011 IL App (1st) 102914, ¶ 33. "This standard of review is deferential to the agency's expertise in interpreting and applying the statutes that it administers." *Id*. When presented with a "mixed question of law and fact, the agency decision will be deemed clearly erroneous only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id*.

¶ 24    Under the Act, as relevant here, a child is abused when a person responsible for the child's welfare:

> "(b) creates a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function[.]" 325 ILCS 5/3(b) (West 2010).

This definition is also in the Code. 89 Ill. Adm. Code 300.20, amended at 35 Ill. Reg. 1599 (eff. Jan. 15, 2011). In addition, however, the Code lists specific allegations of harm that must be made before the agency will accept a report of abuse. 89 Ill. Adm. Code 300.Appendix B (2011). These specific allegations essentially define problematic conduct. *Walk v. Department of Children & Family Services*, 399 Ill. App. 3d 1174, 1181 (2010). Here, plaintiff was indicated under allegation of harm No. 14, which states that tying/close confinement "is the unreasonable restriction of a child's mobility, actions, or physical functioning by tying the child to a fixed (or heavy) object, tying limbs together or forcing the child to remain in a closely confined area that restricts physical movement." 89 Ill. Adm. Code 300.Appendix B (Allegation No. 14) (2011).

¶ 25    Issues concerning abuse and neglect are decided on a case-by-case basis because abuse and neglect findings rely on amorphous concepts that are difficult to define with particularity. *Slater*, 2011 IL App (1st) 102914, ¶ 36; *Walk*, 399 Ill. App. 3d at 1182. Thus, there is little case law exploring these definitions or explaining how the Code relates to the Act. However, there are a few cases that provide some guidance.

¶ 26    In *Walk*, the foster parents of two boys constructed an outdoor enclosure, containing toys and a sandbox, in which to confine the boys when they could not keep them under constant supervision. The boys had previously engaged in extremely violent and disturbing behavior, including eating feces, urinating throughout the house, causing $60,000 in property damage,

and mutilating and killing numerous animals, including stabbing 300 chickens with nails, poisoning two horses, and kicking a dog to death. The foster parents were indicated for abuse, and their petition to expunge was denied. On appeal, the Fourth District determined that the finding of abuse under allegation of harm No. 14 for tying/close confinement was against the manifest weight of the evidence. The court noted that the allegation focused on an unreasonable restriction of a child's mobility and found that the confinement was reasonable given the boys' severe behavioral problems in comparison with how they were confined. For example, they were not confined unnecessarily, the enclosure was large enough for the boys to run in, and the foster parents checked on them while they were in the enclosure. The evidence supported the inference that the enclosure was used to protect the children while the foster parents did chores nearby, not as a form of imprisonment or punishment. *Walk*, 399 Ill. App. 3d at 1188-89. Since the *Walk* court reversed on the sufficiency of the proof of the allegation of harm, it did not discuss whether there was abuse under the Act.

¶ 27    *Korunka v. Department of Children & Family Services*, 259 Ill. App. 3d 527 (1994), better illustrates a court's separation of a finding of abuse under an allegation of harm under the Code and a finding of abuse under the Act. There, a teacher sought to expunge an indicated report of abuse in connection with an incident where the teacher grabbed a misbehaving student and left red marks. The teacher admitted that he acted inappropriately. In reversing the indicated report of abuse, the court stated that, although the ALJ found that the teacher inflicted a cut, bruise, or welt under the relevant allegation of harm in the Code, the regulation also stated that not every bruise amounts to abuse. The court then specifically noted that, beyond the Code, the Act required a finding of abuse. The teacher left marks, but his action did not create any form of abuse under the Act. Further, the court noted that the agency placed improper weight on the teacher's admission that he acted inappropriately: "While this may be true, inappropriate behavior does not necessarily amount to abuse. We need not determine whether [the teacher] could have handled the incident in another way. It is against the manifest weight of the evidence to find the level of contact which occurred in this case amounted to an indicated level of abuse under the [Act]." *Id.* at 532; see also *Lyons v. Department of Children & Family Services*, 368 Ill. App. 3d 557, 561 (2006) (teacher's assistant's actions of taking a behaviorally disordered student to the floor, which caused a bump on the student's head, was not abuse; even if the decision to use that method instead of taking the student to a timeout room was not correct, it did not follow that the teacher's assistant was guilty of abuse); *Briggs v. State*, 323 Ill. App. 3d 612, 619 (2001) (noting that, beyond the allegation of harm, abuse was not shown under the Act).

¶ 28    Courts have at times also taken into consideration the history of the person alleged to have committed abuse. For example, in *Slater*, 2011 IL App (1st) 102914, ¶ 39, a report of neglect was reversed where a child was injured by falling on a pencil left out by her mother. The court noted in part that the mother was normally concerned about the child's whereabouts and that her history of being a good mother was not refuted. Likewise, in *Lyons*, the teacher's assistant had no previous indicated reports or history of violence. *Lyons*, 368 Ill. App. 3d at 561. However, neither of these cases relied solely on the person's good character or the lack of previous findings of abuse, and, in *Lyons*, a consideration of the person's

history was also part of the relevant allegation of harm under the Code (see 89 Ill. Adm. Code 300.Appendix B (Allegation No. 10/60) (2011)).

¶ 29 Ultimately, the cases serve to illustrate that (1) abuse cases must be decided on their unique facts and circumstances; (2) a bad decision will not always constitute abuse; and (3) while the allegation of harm must be proven, the Act cannot be ignored. We note that, since appendix B references section 3 of the Act, these provisions are not meant to be read in isolation, but are meant to be read together. See *In re Marriage of Barile*, 385 Ill. App. 3d 752, 762 (2008). It is apparent that the plain and ordinary meaning of appendix B and section 3 of the Act shows that an indicated finding of abuse should be made where there is a specific harm as described in appendix B that results in abuse as described in section 3 of the Act. In other words, where a child has been tied (89 Ill. Adm. Code 300.Appendix B (Allegation No. 14) (2011)), creating "a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function" (325 ILCS 5/3(b) (West 2010)), an indicated finding should be made. Thus, we determine that a finding that an allegation of harm is proven cannot be sufficient on its own to find abuse. The provisions of the Act, which are also included in the Code, must be met as well.

¶ 30 Here, the ALJ ignored the Act and made findings related only to the question of whether the restraint was unreasonable. The ALJ spent the majority of her analysis in finding that plaintiff lacked credibility as to the use of rope. That factual finding was not against the manifest weight of the evidence, as there was testimony from multiple people that N.C.'s wrists and legs were bound with rope. However, it was also inconsequential to the ultimate determination of whether abuse occurred, because there is no dispute that N.C. was restrained in a manner that heavily impacted her mobility. There was no finding from the ALJ that the agency proved by a preponderance of the evidence that the restraint created a substantial risk of physical injury, by other than accidental means, that would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function–as required by the Act. Failing to apply the Act was error.

¶ 31 Even though the ALJ failed to make a determination about abuse under the Act, we need not remand for that determination. On this record, any finding of abuse would be clearly erroneous.

¶ 32 The only evidence of a substantial risk of physical injury that would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function was the brief opinion testimony from Mitchell that, if an accident occurred while plaintiff was driving, N.C. would be unable to get out of the vehicle. Thus, to reach a determination that the agency proved by a preponderance of the evidence that the restraint created a substantial risk of physical injury, we would be required to conclude that there was a substantial risk not only that an accident would occur but also that it would be serious enough to require N.C. to be able to immediately get out of the van to avoid physical injury. Absent some evidence to support such a conclusion, the agency failed to prove by a preponderance of the evidence the existence of a substantial risk of physical injury.

¶ 33	In its brief, the agency also points to the use of duct tape on N.C.'s mouth area, stating that N.C. could have flailed in a way to cause it to obstruct her breathing or choke her. The agency also asserts that N.C. could have been injured by the restraints. But the agency does not point to any evidence in the record to support these speculations. In the absence of any evidence of a substantial risk of injury, beyond speculation based on hypothetical situations, we are unable to hold that the agency showed that abuse occurred under the Act. Accordingly, we reverse. Because we reverse on the determination that the agency failed to prove abuse under the Act, we do not address whether it also failed to prove that the restraint was unreasonable under the Code.

¶ 34	III. CONCLUSION

¶ 35	The judgment of the circuit court of McHenry County affirming the denial of plaintiff's request for expungement is reversed.

¶ 36	Reversed.