NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230761-U

NO. 4-23-0761

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 3, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MELISSA VENARD, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Peoria County |
| ILLINOIS DEPARTMENT OF CHILDREN AND | ) | No. 23MR27 |
| FAMILY SERVICES, an Administrative Agency of the | ) | |
| State of Illinois; MARC D. SMITH, in His Official | ) | |
| Capacity as Director of Children and Family Services; | ) | |
| JANEY AHERN, in Her Official Capacity as Guardian | ) | |
| Administrator; and MARKO DJURISIC, in His Official | ) | Honorable |
| Capacity as Acting Chief Administrative Law Judge | ) | Frank W. Ierulli, |
| Defendants-Appellees. | ) | Judge Presiding. |

---

JUSTICE DOHERTY delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The decision of the Director of the Illinois Department of Children and Family Services to deny the request for expungement was clearly erroneous.

¶ 2       In August 2022, the Illinois Department of Children and Family Services (DCFS) entered an "indicated" finding of neglect against plaintiff Melissa Venard into the State Central Register following an investigation into an injury to a child for whom Venard was acting as a foster parent. Venard sought to expunge the indicated finding from the register through an administrative appeal. An administrative hearing followed in December 2022, and the administrative law judge (ALJ) issued an opinion and recommendation in January 2023, recommending that expungement be denied. Also in January 2023, Marc D. Smith, the Director of DCFS (Director), issued a written

decision adopting the findings of the ALJ and denying Venard's request to expunge the indicated finding of neglect. Venard then sought review of the Director's decision by filing an appeal under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2022)). In July 2023, the circuit court upheld the Director's decision by oral proclamation from the bench, memorialized with a written order entered the following month.

¶ 3        Venard now appeals to this court, arguing that (1) the determination the minor was neglected was clearly erroneous, (2) DCFS cannot indicate Venard for alleged neglect to the minor while the minor was in the care of another adult, and (3) the ALJ exceeded his authority in issuing his opinion and recommendation. We agree with the first contention and reverse the Director's decision to deny the request for expungement.

¶ 4                                    I. BACKGROUND

¶ 5        R.C. was removed from her biological mother shortly after her birth due to drug abuse during the pregnancy and the child having drugs in her system upon birth. R.C. was placed into the custody and guardianship of DCFS. Venard, a licensed foster parent and R.C.'s paternal aunt, became the foster parent for R.C. shortly thereafter.

¶ 6                A. Incident Leading to the Indicated Finding of Neglect

¶ 7        In June 2022, 18-month-old R.C. was in the care of her grandmother, Lynn C., who was watching R.C. while Venard worked from home in a bedroom in another part of the house. While in the care of Lynn, R.C. grabbed a decorative wooden birdhouse, attempted to run with it, and tripped and fell onto the birdhouse. The fall caused multiple facial lacerations that required surgical intervention. DCFS generated a report of potential abuse or neglect regarding the incident and noted two prior incidents that resulted in R.C. receiving facial injuries.

¶ 8        Following an investigation, DCFS determined that there was credible evidence that

Venard had neglected R.C. as specified in allegation No. 61, "Cuts Bruises Welts Abrasions and Oral Injuries by Neglect," contained in the Illinois Administrative Code (89 Ill. Adm. Code 300.Appendix B (Allegation 11/61) (2017)). In August 2022, a letter issued to Venard by DCFS explained that the basis for the indicated finding was:

> "[R.C.] has sustained three different facial injuries in a 5 month period. Multiple professionals have noted Ms. Venard's lack of child development knowledge and questioned why supervision was not increased after the first and second incident. There are no diagnosed medical or developmental concerns that would attribute to [R.C.'s] injuries. This [public service administrator] further denotes a distinct pattern or chronicity of similar incidents and the fact that all three incidents were severe and will cause scarring and/or deformity."

This indicated finding would be maintained on the State Central Register for 20 years barring a successful appeal. Venard requested an administrative appeal of the indicated finding.

¶ 9                          B. Administrative Hearing

¶ 10        An evidentiary hearing ensued in December 2022 before an ALJ who would render an opinion and recommendation to the Director of DCFS on Venard's request to expunge the indicated finding from the state register. DCFS submitted its investigation file, and the following witnesses testified.

¶ 11                          1. *Dr. Channing Petrak*

¶ 12        Following R.C.'s hospitalization for falling on a birdhouse, a consultation was requested with Dr. Channing Petrak, the Medical Director of the Pediatric Resource Center at the University of Illinois College of Medicine in Peoria, Illinois. She described that the child had suffered facial lacerations that required sutures on the right cheek below the eye and next to the

nose, as well as on the child's forehead. She also noted bruising and swelling below her right eye. She was told the child had picked up a birdhouse while being watched by her grandmother; when told to put it down, the child began to run and fell onto the birdhouse she was carrying. The birdhouse was described as decorative in nature with "a kind of sunflower design so there were multiple points on it based on the design that resulted in multiple facial lacerations." She observed a photo of the birdhouse and what appeared to be dried blood on one of the petals. The petals came to a point, creating edges that could cause an injury.

¶ 13      Dr. Petrak noted two prior injuries in R.C.'s medical history. The first was on January 9, 2022, in which the child suffered a large U-shaped laceration to her forehead that extended down to her eyebrow and eyelid as a result of a fall and collision with a table. The laceration was deep and cut through several layers of tissue, which required a multilayer surgical repair. The injury was unusual for a toddler because, typically, a fall results in the child only landing on the floor and not onto a sharp object. A U-shaped scar from that incident was apparent on the child's forehead when she appeared at the hospital for the birdhouse injury. The second incident took place on February 22, 2022, where R.C. suffered a dog bite to the left side of her face, which resulted in a laceration and puncture that required sutures.

¶ 14      During the consultation, Venard expressed concerns to Dr. Petrak about R.C. having a gait abnormality, speech delay, and behavioral issues, such as tantrums. Dr. Petrak observed R.C. walk around the hospital room and determined her gait was normal for her age, there were no irregularities with her speech, and tantrums were normal at that age. While her gait was normal, Dr Petrak acknowledged that children of that age "do fall." A magnetic resonance image of R.C.'s brain was taken due to intrauterine drug exposure, and the images did not reveal any abnormalities.

¶ 15        Dr. Petrak spent about an hour in the room with Venard and R.C., with 20 minutes of that time spent examining the child. She compiled all of her findings and conclusions in a consultation report and found the history given for the current incident was consistent with the child's injuries, but she was unable to conclude whether the injuries were intentionally inflicted or accidental. She further documented her concern that there was a lack of supervision of the child and that Venard "does not have a good understanding of child development." The report was submitted during the hearing.

¶ 16                                    2. *Kathy Pettet*

¶ 17        Kathy Pettet worked for DCFS as a child protection investigator (CPI) when she was assigned to investigate an allegation of abuse or neglect of R.C. She arrived at the hospital to observe the child and noticed her right eye was noticeably purple with bruising. The eye was swollen shut, and there were lacerations on her face that had been sutured. Pettet noticed other scars on the child's face from prior injuries. Venard explained the U-shaped scar was from when R.C. fell into an end table that had a nail protruding from it and a small scar below her left eye was from a dog bite. In further discussing the prior injuries with other individuals involved in R.C.'s case, Pettet learned that the prior injuries had occurred in a different home than the one where the current injury was sustained. Venard had been living with her parents, Lynn and Bernard, and subsequently moved to the home of her sister, Michelle Meyers.

¶ 18        Venard explained that R.C.'s grandmother had been watching the child in the living room while she was working in a bedroom on the other side of the house. Venard did not witness the incident; she came out of the bedroom when she heard R.C. crying and Lynn calling for her. Venard believed R.C. ended up holding the birdhouse; when the grandmother tried to intervene, the child tripped and "fell face first into the birdhouse."

¶ 19    Venard also claimed that R.C. had been having issues walking and fell down a lot. Venard had reported this to the caseworker and wanted some testing done to determine whether there were some neurological issues based on R.C.'s premature birth and exposure to drugs. Pettet called a reference provided by Venard, and that individual confirmed that R.C. appeared to be clumsy and fell a lot.

¶ 20    Pettet inspected the home where the incident occurred and stated that the low table the birdhouse was located on was readily accessible to the child. Due to the layout of the house, Venard would have been unable to observe the incident from the bedroom. While at the home, Pettet also had the opportunity to interview Lynn, who stated she was babysitting R.C. while Venard worked. R.C. tended to flee when told "no." On the day of the incident, Lynn was sitting on the couch when R.C. picked up the bird house; Lynn told her "no," which resulted in the child running with the birdhouse, Lynn chasing her to retrieve it, and the child finally falling and injuring herself.

¶ 21    Pettet did not see anything that posed a safety risk when inspecting the home and did not find any evidence that either Venard or Lynn deliberately injured the child or that Venard was aware Lynn was not closely supervising R.C. before the incident. Other than the injuries to her face, R.C. was well taken care of. Pettet's investigation did not uncover instances of anyone recommending increased supervision of, or additional protective measures for R.C. following the prior incidents. She also did not ask Venard about whether she had instituted such measures.

¶ 22    Pettet maintained case notes of her investigation and took photographs of R.C.'s injuries and the birdhouse, and they were submitted as evidence during the hearing. The wooden birdhouse was approximately 10 to 12 inches tall, shaped like a sunflower, painted bright yellow and green, and the petals came out to tips.

¶ 23                                   3. *Mindy Fischer*

¶ 24         Mindy Fischer was a caseworker for DCFS and was assigned to R.C.'s case. Fischer described the prior two injuries to the child to the best of her knowledge. Venard was not present for the first injury where R.C. fell into the table because she was quarantining due to COVID-19. Fischer received a text from Venard about the dog bite, advising that the child was being taken to the hospital. She also explained that Venard had informed her of the most recent injury by texting her, sending her a picture of the birdhouse, and stating they were on the way to the hospital. How the birdhouse came to be in the home was never discussed.

¶ 25         Venard had expressed concerns that R.C. was unsteady on her feet on more than one occasion, resulting in an "early intervention referral." To the best of her knowledge, the child was not diagnosed with any disabilities and, based on Fischer's observations, R.C. did not have issues with her hand-eye coordination. R.C. was just a regular toddler learning to walk, and toddlers of her age occasionally fall. There were no recommendations made as far as a change in the level of care for R.C.

¶ 26         Fischer was aware that Venard was employed and worked from home during the day, necessitating childcare. Both Lynn and Bernard underwent background checks to be able to provide childcare while Venard worked. Fischer had visited the grandparents' home on several occasions and had viewed the dog that bit R.C. Prior to the bite, Fischer did not observe anything that would cause her to believe the dog posed a risk.

¶ 27                                   4. *Lynn C.*

¶ 28         Lynn C. also described the prior injuries to R.C. In the first instance, R.C. was in Lynn's living room when she fell and hit her head on a small end table. A nail in the table had started to protrude, and R.C. hit her head on it. The child was taken to the hospital by ambulance,

and the end table was removed from the home. Venard was not present during the incident but came to the hospital shortly thereafter. The incident was investigated by DCFS, and no further action was taken. The second incident also occurred at Lynn's home. Her mid-sized dog, Layla, was sleeping on the couch when R.C. approached the dog and attempted to hug it. This apparently "spooked" the dog, resulting in the bite. Since the bite, Layla and R.C. have been kept separate when in Lynn's home.

¶ 29      On the day of the birdhouse incident, Lynn was watching R.C. at her daughter's home while Venard was working in a back bedroom. Lynn was unaware the birdhouse was in the room, but she confirmed that it was on a table or entertainment center within R.C.'s reach. Lynn was sitting on a couch approximately 8 to 10 feet away from R.C. when she noticed the child was about to reach for the birdhouse. Lynn started to stand and said "no," which tended to cause the child to run. True to form, R.C. began to flee with the birdhouse in her hands. She ran in a straight line from the living room towards the kitchen before falling. From noticing the child reaching for the birdhouse to the fall, the incident lasted roughly 30 seconds to 1½ minutes. After R.C. fell, Lynn got Venard, and they took her to the hospital.

¶ 30                                        5. *Bernard C.*

¶ 31      Bernard is the husband of Lynn, paternal grandfather to R.C., and father of Venard. On the day of the incident, he went to his daughter's home to pick up one of his granddaughters. He arrived at the residence at approximately 12:30 p.m. and brought the birdhouse with him, placing it on the entertainment center. He had been looking for the birdhouse since Venard requested it for one of her other daughters. Venard did not know that he had found the birdhouse, and Bernard did not encounter anyone in the home before placing it on the entertainment center. Lynn and R.C. came into the living room from the kitchen shortly after he set the birdhouse down,

and he did not make them aware of its presence. He confirmed he was aware R.C. played in the living room but did not see a need to alert anyone to the presence of the birdhouse, stating, "I never thought that it was going to lead to what it led to." He left the house after being there for about 5 to 10 minutes and did not speak with Venard while he was there. Around 4 p.m., he received a call about the injury to R.C.

¶ 32                                        6. *Michele Meyers*

¶ 33            Michele Meyers is Venard's sister and Lynn's daughter. She was present for the February 2022 dog bite incident, as were Lynn, Meyers's daughter, and another one of Meyers's sisters, but not Venard, who was at work. The dog was next to Lynn, while Meyers's daughter was seated on the other side of Lynn and Meyers was sitting on an ottoman across from the dog. R.C. approached the dog while it was sleeping on the couch and put her hands on the dog's head and hugged it. This startled the dog, and it bit R.C. in the face. Meyers pulled R.C. away from the dog and later told Venard what happened. She described the dog as sweet and good with people. She was unaware of the dog biting anyone else before or after the incident. After the incident, the dog was kept separate from R.C. While Venard and R.C. resided at her home, Venard used baby gates and corner bumpers in the home to help keep R.C. safe. Lynn had watched both of Meyers's daughters starting when they were babies while Meyers worked five days a week. Neither suffered serious injuries while under her care.

¶ 34                                      7. *Plaintiff Melissa Venard*

¶ 35            Venard is a licensed foster parent and mother to two other teenage girls. She was familiar with child development from raising her two daughters and the foster parent training. She expressed concern to Fischer and others that, in her opinion, R.C. fell down more than other children her age and that "her speech was clearly delayed." She had made Lynn aware of her

concerns.

¶ 36    On the day of the incident, Lynn was watching R.C. while Venard was working in a back bedroom. When she worked from home, Venard would come out of the back bedroom during her lunch break—typically between 1 p.m. and 2 p.m.—to care for and play with R.C. Her usual lunch break consisted of feeding R.C. lunch, checking her diaper, and playing with her, all taking place in the living room. That day, she took her lunch break after Bernard dropped off the birdhouse. While she was in the living room during her lunch break, she did not notice the birdhouse. The birdhouse was wooden and "pretty sturdy," weighing about two pounds. At about 2 p.m., she went back into the bedroom to continue working. Around 4 p.m., she heard R.C. scream and call for help. Venard "jumped up" and went into the kitchen as quickly as she could. Lynn had already picked R.C. up off the ground; the birdhouse was on the ground in front of the stove with blood on it. R.C. had sustained cuts to her face, which as far as Venard could tell were from her falling on the birdhouse. Venard and Lynn took R.C. to the hospital.

¶ 37    Venard also discussed the prior injuries. Regarding the January 9 incident, R.C. had just started walking when she fell into the end table. Venard was not present for that incident, as she was quarantined due to COVID-19. Following that incident, no one from DCFS requested or suggested that her parents not be used for childcare.

¶ 38    With regard to the February 22 dog bite incident, Venard was at work. As far as she knew, the dog had never bitten anyone before or displayed aggressive tendencies. She notified Fischer as soon as she learned of the incident. R.C. had shared the home with the dog since leaving the hospital after her birth approximately a year earlier, and this was the only incident. No one from DCFS made any suggestions about restrictions on the dog in the presence of R.C., even after the bite. Further, no one discussed changing the approach to the level of supervision for R.C.

¶ 39     Fischer was aware Lynn and Bernard were the primary babysitters for R.C. Despite the prior injuries to R.C., Fischer never made any suggestions that Lynn no longer watch R.C. while Venard was working. It was only after the latest incident that DCFS made clear that if R.C. returned to Venard's care, she would have to be enrolled in an approved daycare program.

¶ 40     C. Opinion and Recommendation of the ALJ as Adopted by the Director

¶ 41     In January 2023, the ALJ issued a written decision recommending that the Director of DCFS deny the request to expunge the indicated finding from the state register. The ALJ made findings of fact that included the following. R.C. learned to walk around the end of 2021, and she tended to run away when told "no." Although Venard complained that the child had difficulty walking and fell frequently, R.C. had no special needs or diagnoses. The birdhouse was ornamental with 16 sharp points that were dangerous for a young child to handle, had been left on the entertainment center by Bernard in the living room, and was clearly visible and accessible to R.C., Venard, and Lynn. Venard was in the living room during her lunch break but "either ignored or overlooked the fact that the birdhouse was visible and accessible" to R.C. and failed to move the object. R.C. later picked up the birdhouse and ran from Lynn when she tried to remove it from her possession, resulting in a fall onto the birdhouse that caused injuries to her face.

¶ 42     Regarding the prior injuries, the ALJ determined that the January 9 incident resulted from R.C. falling and striking a small end table that had a nail protruding from it. The incident occurred while Lynn was watching the child, and the fall was not directly observed by any adult. Medical evaluations determined the injury was consistent with the explanation. The February 22 dog bite incident resulted from R.C. approaching a mid-sized dog that was sleeping next to Lynn when R.C. startled it.

¶ 43     The ALJ concluded it was "uncontroverted" that R.C. suffered severe facial

lacerations in the June 2022 incident, and the issue to be resolved was whether those "injuries stemmed from [Venard] acting in a neglectful manner pursuant to Allegation of Harm #61." Applying the statutory definition of "neglected child" and the corresponding standards for the allegation of harm in the DCFS regulations, the ALJ found that Venard neglected R.C. in that she "subjected [R.C.] to an environment that created a likelihood of harm to her health, physical well-being, or welfare and that the likely harm was the result of [Venard's] blatant disregard of her responsibilities as caretaker." That same neglect led to R.C. sustaining lacerations consistent with the allegation of harm asserted by DCFS.

¶ 44    The reasoning set forth in the order was that as R.C.'s "caretaker, [Venard] was responsible for ensuring that [R.C.'s] environment was free from any significant hazards that could pose a risk of harm to her." Especially in light of R.C.'s "apparent proclivity for getting into severe accidents, [Venard's] belief that [R.C.] had problems walking, [R.C.'s] complete lack of self-protective ability, and the reality that [Lynn] is not a sufficiently attentive or agile babysitter," R.C. required more attention than the average child of her age. The prior incidents should have led Venard to be mindful of R.C.'s environment and "to compensate for [Lynn's] inability to adequately watch and keep up with [R.C.]" The ALJ explained further:

> "When [Venard] came out of her room for lunch, she should have carefully examined the living room and moved the birdhouse to a location that was inaccessible to [R.C.] [Venard] failed in this regard. Even assuming the birdhouse had only been sitting within [R.C.'s] reach for a few hours before the accident, [Venard's] failure to even notice the birdhouse was an indication that she did not take sufficient steps to adequately secure [R.C.'s] environment from hazards. The birdhouse would have been extremely visible and clearly appealing to a toddler or

young child. [Venard], being familiar with the birdhouse, should have been aware that [it] would not be safe to be handled by [R.C.] Given the significant damage the birdhouse caused to [R.C.'s] face and CPI Pettet's description of the petals as 'sharp', [Venard's] disregard of the birdhouse was tantamount to ignoring knives left within a child's reach. [Venard's] failure to adequately monitor [R.C.'s] environment rose to the level of blatant disregard: a reasonable caretaker in these circumstances would have taken diligent precautions to ensure that [R.C.'s] environment was safe from such obvious hazards."

¶ 45 The Director adopted the findings of the ALJ and denied the request to expunge the indicated finding.

¶ 46 D. Administrative Review in the Circuit Court

¶ 47 In February 2023, Venard filed a complaint for administrative review in the circuit court, seeking reversal of the Director's adoption of the ALJ's opinion and recommendation. The parties filed memoranda addressing the merits, and in July 2023, the court held a hearing. After considering the parties' filings and arguments, the court issued an oral ruling from the bench affirming the Director's decision. Although the court disagreed the birdhouse was the equivalent of knives, it noted that Venard had "a responsibility to ensure that the [child's] environment [was] free from significant hazards." Accordingly, the Director's decision was "appropriate" and could not be deemed clearly erroneous. A written order followed memorializing the oral ruling.

¶ 48 This appeal followed.

¶ 49 II. ANALYSIS

¶ 50 Venard presents three arguments for the reversal of the Director's decision to deny her request for expungement of the indicated finding from the State Central Register: (1) the

finding that R.C. was neglected was clearly erroneous; (2) pursuant to state statute, DCFS could not have indicated her for neglect when R.C. was in the care of another responsible adult outside of her purview; and (3) the ALJ exceeded his authority in finding that Venard neglected R.C. We find the first issue to be dispositive of this appeal.

¶ 51                    A. The Abused and Neglected Child Reporting Act

¶ 52          Pursuant to the Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/1 *et seq.* (West 2022)), DCFS maintains a register of all suspected cases of child abuse and neglect reported to the agency. *Id.* § 7.7. Following a report of suspected abuse or neglect, DCFS investigates and concludes whether the report is " 'indicated,' " " 'unfounded,' " or " 'undetermined.' " *Id.* § 7.12. An indicated finding results when the investigation finds credible evidence that "the alleged abuse or neglect exists," and such a finding must be entered into the register. *Id.* §§ 3, 7.12. Evidence of child neglect is deemed to be "[c]redible" where "the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Adm. Code 300.20 (2018).

¶ 53          Once the indicated finding is entered into the register, the subject of the report may request that DCFS expunge the report therefrom and is entitled to an administrative hearing to determine whether the report should be removed. 325 ILCS 5/7.16 (West 2022). At the hearing, DCFS has the burden of proof to show that by a preponderance of the evidence the report supports the indicated finding. 89 Ill. Adm. Code 336.115(c)(2)(B) (2017). The hearing is presided over by an ALJ, who issues a recommendation on the request for expungement to the Director, who may, among other things, accept or reject that decision. 89 Ill. Adm. Code 336.120(b)(15) (2017); 89 Ill. Adm. Code 336.220(a)(1) (2017). The Director's decision is the final order for purposes of appeal, and jurisdiction for initial review is vested in the circuit court. 89 Ill. Adm. Code

336.220(a)(1) (2017); 735 ILCS 5/3-104 (West 2022).

¶ 54                                    B. Allegation and Definitions

¶ 55        The indicated finding of neglect against Venard is based on allegation No. 61 in DCFS's regulatory scheme in that she inflicted a cut, bruise, welt, abrasion, or oral injury upon R.C. 89 Ill. Adm. Code 300.Appendix B (Allegation 11/61) (2017). The guidance given following the allegation in the Illinois Administrative Code makes clear that "[n]ot every cut, bruise, welt, abrasion, or oral injury constitutes an allegation of harm." *Id.* Rather, several factors are to be considered: (1) "the child's age, mobility and developmental stage"; (2) "the child's medical condition, behavioral, mental, or emotional problems, [and] developmental disability"; (3) whether there is a "single incident or pattern or chronicity of similar events"; (4) the severity and extent of the injury; (5) the location of the injury; (6) "the pattern of the injury"; (7) "[w]hether the injury was caused by an instrument used on the child"; and (8) whether a "previous history of indicated abuse or neglect, or history of previous injuries" exists. *Id.*

¶ 56        Additional definitions relevant to our review include that of a "neglected child" and "blatant disregard." The reason that we need to consider these definitions from the Act stems from the burden on DCFS to not only establish the allegation of harm, but to also establish provisions set forth in the Act regarding neglect. See *Shilvock-Cinefro v. Department of Children & Family Services*, 2014 IL App (2d) 130042, ¶ 29. Merely proving by a preponderance of the evidence the allegation of harm occurred is insufficient to establish abuse or neglect. *Id.*

¶ 57        "Neglected child," as relevant in this context, is defined as "(i) the child's environment creates a likelihood of harm to the child's health, physical well-being, or welfare and (ii) the likely harm to the child is the result of a blatant disregard of parent, caretaker, [or] person responsible for the child's welfare." 325 ILCS 5/3 (West 2022).

- 15 -

¶ 58       "Blatant disregard" is defined as "an incident where the real, significant, and imminent risk of harm would be so obvious to a reasonable parent or caretaker that it is unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures to protect the child from harm." *Id.*

¶ 59                    C. Administrative Review in the Appellate Court

¶ 60       When engaging in administrative review, an agency's findings of fact are deemed *prima facie* true, and we must limit our review of the finding of those facts to whether they are against the manifest weight of the evidence. *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 30. An issue consisting of mixed questions of law and fact is examined to determine whether it is clearly erroneous. *Id.* "An agency's decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Board of Education of Springfield School District No. 186 v. Attorney General of Illinois*, 2017 IL 120343, ¶ 68. Once appealed to this court, our review is focused on the administrative agency's decision and not the determination of the circuit court. *City of East Peoria v. Melton*, 2023 IL App (4th) 220281, ¶ 50.

¶ 61       Here, it is clear that DCFS proved that R.C. suffered lacerations and bruising as alleged in this case. This showing is sufficient to establish the allegation of harm presented against Venard as defined within DCFS regulations. What is less clear is whether the injuries resulted from neglect as defined by the Act and required to be proven by DCFS. In analyzing whether neglect was proven, we turn first to the findings of fact.

¶ 62                              1. *Findings of Fact*

¶ 63       Reviewing the factual findings, DCFS found that Bernard was the one who introduced the birdhouse into R.C.'s environment, and there is a tacit admission that Venard was

initially unaware of its presence in the home. Despite this acknowledgement, it was found that the failure to discover that the object was within the reach of R.C. in the living room during Venard's hour-long lunch break was tantamount to leaving knives within the reach of the child. Our review of the evidence presented at the hearing shows this finding to be against the manifest weight of the evidence. Looking at the photographic evidence, the object appears as described by multiple witnesses: a roughly foot tall, ornate birdhouse made from wood in the design of a sunflower. We attach a photograph of this object below for a clear understanding of the instrumentality that caused the injury at issue.



¶ 64        At first glance, the birdhouse is innocuous enough. While certain petals of the flower design come to a sharper edge than others, we are unable to conclude that those edges are "sharp" in a way remotely comparable to kitchen knives. As explained above, we are not reviewing

the decision of the circuit court, but we note that the lower court also rejected the comparison of the wooden birdhouse to knives. This is a conclusion we agree with, as this was a birdhouse constructed of wood, not a cutlery set. While the photographs of and testimony concerning the object indeed show that the petals on the birdhouse form edges, this is no different than a multitude of other common, everyday objects located within the average home that a reasonable person would not equate with a kitchen knife.

¶ 65    Another finding of fact used to support the conclusion of neglect is that there was a pattern of injuries resulting in facial injuries to R.C. Without a doubt, if one were to only look at the end result of these incidents—injuries to the child's face—a conclusion could be drawn that there is a pattern here. Nonetheless, when looking at how the injuries were caused, support for such a claim falls away.

¶ 66    It is important to note that both prior injuries occurred at Lynn's home before Venard and R.C. moved to Meyers's home. As described by every witness on the topic, the January 9 incident appears to be a situation in which a toddler learning to walk had the misfortune of stumbling into an end table that had a nail protruding from it. Common sense dictates that a fall while a child is learning to walk is not out of the ordinary. While R.C. falling and colliding with a piece of furniture is not out of the ordinary, as noted by Dr. Petrak, the resulting severe injury is what stood out. Comparing this incident to that at issue, aside from the child receiving a facial injury, this injury does not lead to the conclusion that there was a pattern or chronicity of injuries. There is no information in the record to suggest that Venard or anyone else knew of the presence of the nail beforehand. Furthermore, DCFS itself inspected Lynn's home and approved it before this injury occurred. Apparently, this inspection also failed to discover the nail protruding from the table. Immediately following the incident, the child received appropriate medical care, and the

instrumentality of her injury was removed from her environment.

¶ 67    The February 22 injury is even more attenuated from any alleged pattern. Again, the only commonality between this incident and the others is the fact that it resulted in a facial injury. DCFS found that the dog was sleeping immediately next to Lynn when R.C. startled the animal, resulting in a bite to her face. The dog did not have a history of biting people, and the child received immediate medical attention. Following this incident, measures were taken to separate the child and the dog. There is no testimony that DCFS voiced any concerns with R.C.'s environment following this incident. With no foreknowledge of an issue with the dog and an appropriate response thereafter, this can hardly be said to be an instance of neglect on Venard's part, and it certainly does not support a pattern prior to the event in question.

¶ 68    The birdhouse incident occurred after Venard and R.C. moved out of Lynn's home. While the injury she sustained was similar, the instrumentality was different from both prior accidents. R.C. did not merely fall into a piece of furniture while walking, nor was she bitten by a dog; she fell while running with a birdhouse.

¶ 69    Based on the pattern of these prior incidents, DCFS found that Venard needed to be "very mindful" in order to clear the environment of any possible threats to R.C. Having already found that the birdhouse is by appearance a rather innocuous object and the happenstance of the injury was not a mere fall, it appears DCFS was holding Venard to a standard that bordered on clairvoyance to envision how R.C. could injure herself with this object. The testimony and findings of fact below established that Venard would have had only an hour to discover the object when, during this short period of time, her attention was squarely affixed on R.C. Coupled with this short period of time is also the issue of DCFS's speculation that Venard saw the birdhouse at all, including the suggestion that, if she did not see it, she was neglectful for failing to see it and

appreciate the obvious danger it posed. *Cf. In re Zion M.*, 2015 IL App (1st) 151119, ¶ 35 (finding speculation by the State that a mother may have known about the presence of an obviously dangerous object brought into the home by another was insufficient to prove neglect by a preponderance of the evidence). The unrebutted testimony and the agency's own findings of fact appear to establish that Venard was not aware the birdhouse was present in the home prior to her hour-long lunch break, and its orientation on the entertainment center (whether the flower design was forward facing or not) to determine the probability she saw the object during her lunch break was not discussed at the hearing.

¶ 70　　　　In this same vein, we also view the finding that Venard had to compensate for Lynn's "inability to adequately" supervise the child unsupported by the evidence. There is no evidence except the injuries themselves that Lynn was an inadequate babysitter; the testimony was actually the opposite. She passed background checks and was approved by DCFS, and at no time did the agency express misgivings about her watching R.C. Testimony established that she was used as a babysitter by multiple members of the family and had watched other grandchildren during their developmental stages without incident. As discussed above, aside from the resulting injury, the January 9 fall is a common occurrence for children R.C.'s age and the dog bite, which was uncharacteristic for the animal, does not weigh on Lynn's adequacy to render childcare. That leaves us with a situation where Lynn testified that she saw R.C. reach for the birdhouse but was not quick enough to retrieve the object from the child before she fell to the floor with it. If DCFS wanted to indicate Venard for continuing to allow Lynn to supervise R.C., there is a separate allegation of harm that is amenable to that factual circumstance. See 89 Ill. Adm. Code 300.Appendix B (Allegation 74, Option C). (2017). That allegation was not filed.

¶ 71　　　　Moreover, during the hearing DCFS made a concerted effort to use Venard's

concerns about R.C.'s possible developmental disability as a reason she should have expected the child to fall more often, but then pivoted to saying that the incorrectness of Venard's fears of a disability demonstrated that she was ignorant of childhood development. While acknowledging that toddlers often do fall when learning to walk, the witnesses called by DCFS made clear that there were no developmental concerns when it came to R.C.'s motor functions. Despite this consensus that R.C. had the normal function of a child her age, DCFS found R.C. had a proclivity for "getting into severe accidents." Essentially, DCFS concluded that although Venard's concerns were valid, they also showed a lack of understanding of childhood development on her part. Effectively, R.C. was not disabled but merely clumsy. In its brief on appeal, the agency states that despite R.C.'s "limited motor skills," Venard did not exercise adequate supervision. This statement shows the inherent inconsistency in the arguments presented: it argues on the one hand that R.C. had no developmental issues, and on the other that she was so limited she essentially needed to be placed in a protective bubble.

¶ 72                                    2. *Director's Decision*

¶ 73        Having found certain findings of fact were contrary to the manifest weight of the evidence, we turn to the Director's ultimate decision to deny expungement. It is apparent that R.C. suffered lacerations and bruising as claimed in the allegation of harm. However, DCFS must also satisfy its burden under the Act that R.C. was a neglected child, requiring us to consider whether the birdhouse was an obvious hazard that posed a probability of harm and that it was a blatant disregard of her duty for Venard to fail to remove it from the living room. We have already found that the birdhouse presented as an innocuous object upon first glance and could not be described as an obviously dangerous object upon closer inspection. We are unable to conclude that the object posed an imminent risk of harm obvious to a reasonable person. Following our review, we are left

- 21 -

with the firm conviction that DCFS failed to show by a preponderance of the evidence that R.C. was neglected.

¶ 74     This appears to be a case where the injury itself, standing alone, informed a finding of neglect, a result that is not permissible. See *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 37. This is apparent from the ALJ stating in his order that the significance of the injury served to establish the dangerousness of the birdhouse. Of course, logic demands the conclusion that if an individual were to land face-first on almost any object with edges, there would be an injury.

¶ 75     Both parties argue the applicability here of *Slater*, where a minor under the supervision of his mother grabbed a sharpened colored pencil the mother had been using, ran with the object, fell onto it, and punctured his lung. *Id.* ¶ 3. The ALJ made a finding that the mother engaged in a blatant disregard of her parental duties by leaving the pencils within the reach of the child. *Id.* ¶ 17. Based on the recommendation of the ALJ, the Director denied the request for expungement. *Id.* The circuit court affirmed the decision, but the appellate court reversed, finding the decision clearly erroneous. *Id.* ¶¶ 1, 19. The appellate court explained that the evidence demonstrated the injury was "the result of an isolated incident that could happen to anyone." *Id.* ¶ 39. It was not the case that the mother left her child unsupervised or even the case that the pencils were "an obviously dangerous object, such as a knife." *Id.*

¶ 76     DCFS argues that because *Slater* was decided under a previous definition of neglect, it is not useful as an analogue. While we agree to a certain extent, it is because cases of abuse and neglect are to be decided on a case-by-case basis, where "each case hinges on its own particular set of facts." *Walk v. Department of Children & Family Services*, 399 Ill. App. 3d 1174, 1182 (2010). What we do find similar and appears to be dispositive in both cases is that the child

was injured by an item that could be dangerous if fallen on and could result in a severe injury but was not obviously dangerous. *Slater*, 2011 IL App (1st) 102914, ¶ 39. Moreover, as Venard points out, *Slater* was decided under a less demanding definition of neglect than is currently required under the Act. See *Slater*, 2011 IL App (1st) 102914, ¶ 35 (noting that a showing of blatant disregard was not required under state statute at the time). In addition to *Slater*, the guidance provided in the Illinois Administrative Code holds true in this case: "Not every cut, bruise, welt, abrasion, or oral injury constitutes an allegation of harm." 89 Ill. Adm. Code 300.Appendix B (Allegation 11/61) (2017).

¶ 77    Based on the record, we are left with the definite and firm conviction that a mistake has been committed, as DCFS failed to meet its burden by a preponderance of the evidence. Therefore, we find that the Director's decision to deny expungement of the indicated finding of neglect was clearly erroneous. Since we agree with Venard's contention that the Director's decision was clearly erroneous, we need not address the remaining contentions on appeal.

¶ 78                                III. CONCLUSION

¶ 79    For the reasons stated, we reverse the circuit court's judgment and the Director's decision.

¶ 80    Circuit court judgment reversed.

¶ 81    Director's decision reversed.